IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

STERLING D. BROWN,
        Plaintiff,

v.                               Civil Action No. 2:18-cv-922

City of Milwaukee, et al.
        Defendants.

## PLAINTIFF'S BRIEF IN SUPPORT OF MOTION TO STRIKE RULE 68 OFFER OF JUDGMENT

Now comes the PLAINTIFF, Sterling Brown, by and through his attorneys, GINGRAS,

THOMSEN & WACHS LLP, and submits this Brief in Support of Motion to Strike the Rule 68

Offer of Judgment. Plaintiff respectfully requests that this Court grant the motion because:

1. The Federal Rules of Civil Procedure mandate that they be construed with an eye towards "just" results, and Defendants' weaponization of Rule 68 is anything but just.

2. Defendants are responsible for the incredible costs and fees born by Mr. Brown by unnecessarily litigating that which they were in good faith required to admit since before the lawsuit was filed.

3. By unnecessarily inflating these costs and fees through the assertion of meritless defenses and denials, Defendants have left Mr. Brown with no opportunity to truly "evaluate the risks and costs of litigation" and "think very hard" about the value of continued litigation, as required by Rule 68.

4. The City's conduct has undone the principles underlying Rule 68 and Rule 1 and the offer should be stricken.

### FACTS PERTINENT TO THIS MOTION

The Defendants' deposition testimony and other admissions in discovery show the

Defendants' answer denying the violation of Mr. Brown's civil rights and blaming him for his

injuries is largely without merit. The avalanche of testimony gathered from the Defendant officers

establishes that from shortly after the incident onward, Defendants understood their culpability for

1

Mr. Brown's race-based and illegal stop, arrest, attack (including tasing him in the back), and then for detaining him in handcuffs.

Defendant Collins testified that the entire internal affairs process was jump-started the very next day. (Thompson Aff. Ex. E. 51-52). Then, before Mr. Brown even filed his complaint, the Milwaukee Police Department conducted a "remedial training" with the Defendants to instruct them on precisely how and why their conduct on the night in question was inconsistent with their training and written policies, and to explain that things "should have been done different[ly]." (Thompson Aff. Ex. B 26:3-27:22.) This 'remedial training' took place on Monday June 11, 2018. (Thompson Aff. Ex. C 37:1-2.) A spate of high-ranking staff oversaw the training. (Thompson Aff. Ex. C 18:19-23, 20, 36, 52:3-12.) It is now clear, Defendants have known since *before* this lawsuit was filed that its officers violated their training and Mr. Brown's constitutional rights during their interaction with Mr. Brown in January of 2018. (Thompson Aff. Ex. B 26:3-27:22 50:1-7; Thompson Aff. Ex. E 25: 17-21, 40:24-41:9; Thompson Aff. Ex. C 17:1-18:23.)

The complaint alleges that as a result of the officers' unlawful conduct and as a result of the department's policies and practices, Mr. Brown's constitutional rights were violated. See Dkt. 1. In depositions, Defendants have admitted this. Officer Andrade:

> Q.   Based on the training that you received, you would agree with me that because [Mr. Brown] wasn't allowed to leave, his constitutional rights were violated, correct?
> A.   Yes.

(Thompson Aff. Ex. B 42:2-5.) Defendant Avila admitted that he 'partially' agreed with this conclusion from Defendant Andrade. (Thompson Aff. Ex. G 49:10-15, 50:11-15.) Sergeant Krueger:

> Q.   [The complaint submitted by Chief Alfonso Morales regarding charges against Sergeant Krueger] says, in quotes, "His failure in not allowing the initiating officer to conduct his investigation and resolve with a citation as prescribed by the

|     |                                                                                      |
| --- | ------------------------------------------------------------------------------------ |
|     | violation in question led to the escalation of force and concluded with eight officers using force and a citizen being tased." Did I read that correctly? |
| A.  | Correct.                                                                              |
| Q.  | And the "his failure" there, that's a reference to Sergeant Krueger – you. Correct?   |
| …   |                                                                                      |
| A.  | Yes.                                                                                 |
| …   |                                                                                      |
| Q.  | And you admitted to the charges Correct?                                              |
| A.  | Yes.                                                                                 |
| Q.  | And when you took responsibility for your actions, you were admitting that your failure to act in a proper supervisory manner resulted in Mr. Brown being taken down and tased. Correct? |
| …   |                                                                                      |
| A.  | I believe that my failure to supervise did not – I wouldn't say my failure was the exact and direct reason it happened. It was definitely a part of the reason that the outcome was the way it was. |
| Q.  | I guess that's fair, because there were two sergeants involved. Correct?              |
| A.  | Yes, sir.                                                                            |

(Thompson Aff. Ex. D 96:10-24, 97:15-24, 98:1-9.) Officer Collins:

|     |                                                                                      |
| --- | ------------------------------------------------------------------------------------ |
| Q.  | Do you agree based on the training that you received that because Mr. Brown was not allowed to leave, his constitutional rights were violated? |
| …   |                                                                                      |
| A.  | Knowing that it was just a parking citation, yes.                                     |

(Thompson Aff. Ex. E 37:10-15.) Defendants' testimony is outlined furthermore herein:

A.      <u>Pertinent Admissions</u>

The admissions revealed in discovery raise significant questions about the pending Rule 68 Offer of Judgment as well as fundamental questions about the merit of the vast majority of denials contained within Defendants' operative answer. To date, defendants have admitted, under oath, that:

1. Mr. Brown's constitutional rights were violated as a result of the officers' unlawful conduct. (Thompson Aff. Ex. B 42:2-5; Thompson Aff. Ex. G 49:10-15, 50:11-15; Thompson Aff. Ex. D 96:10-24, 97:15-24, 98:1-9; Thompson Aff. Ex. E 37:10-15.)

2. Defendant Grams directed language with racist connotations at Mr. Brown on the night in question. (Thompson Aff. Ex. B 39:14-21; Thompson Aff. Ex. C 41:12-42:16, 46:3-12; 46:8-11; Thompson Aff. Ex. D 68:23-69:8; Thompson Aff. Ex. E 30:4-8, 60:10-24.)

3. Defendant Grams used excessive or unreasonable force when he first pushed Mr. Brown at the initiation of his interaction. (Thompson Aff. Ex. C 41:5-11; Thompson Aff. Ex. E 34:9-14.)

4. The City of Milwaukee instructed the defendant officers that Defendant Grams' failures in his approach caused the entire incident to take place. (Thompson Aff. Ex. B 40:19-25.)

5. Defendant Grams never had reasonable suspicion that Mr. Brown committed a crime when he detained him. (Thompson Aff. Ex. B 42:22-24, 46:6-11; Thompson Aff. Ex. E 11:1-18; Thompson Aff. Ex. C 54:22-55:7.)

6. There was no proper basis to continue to detain Mr. Brown other than to issue him a citation. (Thompson Aff. Ex. E 11:7-18; Thompson Aff. Ex. D 49:11-50:4; Thompson Aff. Ex. C 28:9-14.)

7. Mr. Brown's actions, including having his hands in his pockets, did nothing to cause the officers any fear for their safety in the Walgreens parking lot. (Thompson Aff. Ex. B 31:10-32:11, 33:1-6; Thompson Aff. Ex. F 57:1-5; Thompson Aff. Ex. C 29:1-25.)

8. Sergeants Mahnke and Krueger were responsible for unnecessarily creating fear in the other responding officers, on the basis of constitutionally-protected conduct (targets with holes), thus causing the entire attack, inciting tasing and arrest. (Thompson Aff. Ex. B 50:1-7, 54:14-20; Thompson Aff. Ex. E 38:9-14, 39:21-25.)

9. Sergeant Krueger never actually believed that Mr. Brown could have a gun in his pocket at the scene, and Sergeant Krueger subsequently lied in an internal affairs interview to say that he saw a gun in Mr. Brown's car in an attempt to justify the defendants' conduct. (Thompson Aff. Ex. D 56:10, 84:7-85:8.)

10. The City of Milwaukee has already instructed the Defendant officers that they used repeated and excessive force against Mr. Brown in the parking lot. (Thompson Aff. Ex. E 40:24-41:9.)

11. Mr. Brown was subjected to excessive force by the police officers on the scene. (Thompson Aff. Ex. E 26:22-27:4, 40:24-41:9)

12. Officers failed to intervene to stop unlawful conduct, resulting in a complete deprivation of Mr. Brown's constitutional rights. (Thompson Aff. Ex. B 68:6-22, 76:11-19, 77:2-8, Thompson Aff. Ex. C 103:4-6.)

These admissions and others are analyzed in context below.

    B.    <u>Unlawful Approach and Stop By Officer Grams</u>

"[A]ll courts should be reluctant to endorse the ability of police officers to engage in illegal stops." *Hardy v. City of Milwaukee*, 88 F. Supp. 3d 852, 879 (E.D. Wis. 2015). "[T]he stop must be justified at its inception and be reasonably related in scope to the circumstances which justified the interference in the first place… [A stop is permissible when an officer] has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity. The officer "may not, however, rest only upon his intuition; the officer must provide 'specific' and 'objective' facts justifying the stop." *United States v. Green*, 111 F.3d 515, 519 (7th Cir. 1997)(internal citations and quotations omitted).

Defendants admit Defendant Grams' initial approach of Mr. Brown was conducted inappropriately, thus *causing* Mr. Brown to be taken down, tased and arrested. (Thompson Aff. Ex. B 35:15-21, 36:12-14, 37:4-6. Thompson Aff. Ex. G 22:7-13; Thompson Aff. Ex. E 11:1-18, 13:18-14:5; Thompson Aff. Ex. C 41: 5-7, 123:9-15.) They testified that they were specifically trained on why Grams' intial approach was the taproot for the entire calamity. (Thompson Aff. Ex. B 40:19-25; see also Thompson Aff. Ex. B 29:14-16 ("If I would have been the initial officer, we would never be here today"), Thompson Aff. Ex. E 36:6-21; Thompson Aff. Ex. C 21-24.) These admissions all demonstrate the City recognized the conduct of the defendant officers was improper and unconstitutional during the remedial training *before* the instant lawsuit was filed.

Defendants admitted that Defendant Grams used racially-motivated language against Mr. Brown at the outset of his approach. (Thompson Aff. Ex. B 37:7-9, 39:14-21, 43:14-25; Thompson Aff. Ex. C 41:12-2, 46:8-11; Thompson Aff. Ex. D 68:23-69:8; Thompson Aff. Ex. E 30:4-8.) According to Defendant Samardzic, this was in specific violation of their training. (Thompson Aff. Ex. C 42:5-13.) This occurred when Defendant Grams told Mr. Brown "I own this" as he first approached him. This is in harmony with the allegations of Mr. Brown's complaint, and wholly

inapposite to the language of the Defendants' joint answer. See Dkt. 1. Defendant Collins' testimony left no doubt:

> Q. … What do you recall being pointed out?
> A. I know the biggest thing that was pointed out was the comment that Officer Grams made stating that he owns this.
> Q. And what was the point being made?
> A. …Well, it was the statement he made, and then Sterling Brown's remark saying, "You don't own me."…Remarks were made by the instructor that that statement could be construed as a racial thing going back to the slavery days.
> Q. Do you agree with that?
> A. That the comment was wrong?
> Q. Yeah.
> A. Yes.

(Thompson Aff. Ex. E 60.) The entire interaction was unlawful from the outset. Defendant Collins could not have been clearer:

> Q: And you would agree that Officer Grams' failure to properly handle the initial contact with Mr. Brown resulted in Mr. Brown's ultimately being taken down, tased, and arrested.
> A: Yes.

(Thompson Aff. Ex. E 14:1-5.) Defendant Andrade stated:

> I guarantee if [Officer Grams] would have just walked up and identify yourself as a police officer, give him the reason you're there, like you're trained and supposed to, I think that sets the tone for everything, and I don't think we'd even be here if that was the case.

(Thompson Aff. Ex. B 30:19-24.)

C.     Mr. Brown's Unlawful Arrest

To prevail in an unlawful arrest action, the plaintiff must show lack of probable cause. *Simmons v. Pryor*, 26 F.3d 650, 654 (7th Cir. 1993) (citing *Schertz v. Waupaca Cnty.*, 875 F.2d 578, 582 (7th Cir. 1989)). Probable cause is a reasonable ground for belief in guilt. *Maryland v. Pringle*, 540 U.S. 366, 371 (2003). To determine whether an officer had probable cause to arrest an individual, courts examine the events leading up to the arrest, and then decide "whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to" probable cause. *Id*. (citing *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).

6

According to Defendant Samardzic, Mr. Brown was startled as the cadre of officers advanced upon him. (Thompson Aff. Ex. C 49:23-25.) The officers received remedial training which clarified that Mr. Brown's arrest was improper:

> Q: And then, [Milwaukee Police Department's] Detective Metz said there was no articulable reasonable suspicion of any crime, correct?
> A: Yes, sir.

(Thompson Aff. Ex. B 44:1-4.) Defendants admit the arrest was improper and was done without probable cause. Indeed, officers admit they arrested Mr. Brown without "reasonable suspicion" – a threshold *below* that of probable cause. (Thompson Aff. Ex. B 42:22-24, 46:6-11; Thompson Aff. Ex. D 49:11-50:4; Thompson Aff. Ex. C 54:22-55:7.)

These admissions by Defendants Andrade, Samardzic and Krueger[1] are unsurprising. Defendant Grams' reasoning for arresting Mr. Brown is ludicrous, and (even to-date) ever-changing. Defendant Grams explained his thought process under oath, at his deposition on May 30, 2019, stating he believed Mr. Brown was a mass murderer:

> It's the only car in the whole lot; positioned for a quick exit out of the parking lot; so a perfect armed robbery car. The car was running. There was a lookout in the car, and its positioned to flee directly out the parking lot…I couldn't let him pass into his car because there could have been dead people in the Walgreens until we verified that.

(Thompson Aff. Ex. J 120:21-121:3, 121:01-06.) Defendant Grams **never** mentioned robbery and mass murder to anyone who responded to the scene. (Thompson Aff. Ex. D 101:10-18; Thompson Aff. Ex. F 56:16-19.) It seems this information would be worth passing along if it was truly on Defendant Grams' mind at the scene. This is nothing but part of a fabricated defense.[2]

---

[1] Notably Defendant Krueger had ample opportunity pre-suit to analyze the entire situation. He testified that he actually reviewed the pertinent body camera footage four times before answering the complaint. (Thompson Aff. Ex. D13:9, 12, 14:20-23.)

[2] Grams even admitted he invented this story at the moment he was testifying in his deposition. (Thompson Aff. Ex. J 121:8-12.)

7

Defendant Collins admitted that Defendant Grams offered a ridiculous articulation of suspicion or probable cause, which would be insufficient to detain someone. When Defendant Collins was asked what Officer Grams did which violated Mr. Brown's rights, he explained:

> The basis of stopping him. I don't believe he had the knowledge that he was actually trying to commit a crime. The whole aspects of the way the motor vehicle was parked, him thinking that a possible armed robbery is going on at Walgreens, the possible lookout inside the vehicle not sitting in the driver's seat, parked towards a brick wall, and as Sterling Brown is walking out the Walgreens, if he was an armed robbery suspect, he'd do one of two things: either walk towards the officer and shoot him, or run the other way. Mr. Brown walked towards the officer and started talking with him.

(Thompson Aff. Ex. E 11:7-18.)

The "other reasons" previously maintained by the City for Mr. Brown's detention are also constitutionally deficient, and Defendants admit this too. For example,[3] Defendant Krueger initially claimed he had the authority to arrest and detain Mr. Brown for resisting arrest after Mr. Brown "flailed" his arms. However, in his deposition, Defendant Krueger admitted Mr. Brown was already detained *before* the alleged-arm "flailing" ever occurred:

> Q:      … You would agree with me at no point in time was there reasonable suspicion that Mr. Brown had ever committed a crime. Correct?
> …
> A:      I would disagree with that at the time we felt – or I had felt that we had resisting.
> Q:      He'd been detained before that point in time already, right?
> …
> A:      Yes. But at that time – well yes.

(Thompson Aff. Ex. D 49:11-50:4.)

Defendant Krueger also admitted Mr. Brown's practice targets were constitutionally-protected, and created no reasonable suspicion that he was armed:

> Q.      And the fact that there's a target with holes in the back seat of a car does not constitute a reasonable suspicion that a person is armed. Correct?
> …
> A.      Correct.

---

[3] To be clear, this submission does not include all the admissions obtained to date.

(Thompson Aff. Ex. D 77:17-78:13.) The City of Milwaukee specifically instructed the Defendant officers that these targets were an insufficient basis for reasonable suspicion *before* this lawsuit was filed. (Thompson Aff. Ex. B 42:25-43:2, 46:6-11) When asked to confirm that Detective Metz of the MPD pointed out to the Defendant officers that the targets were not any basis for reasonable suspicion, Defendant Andrade confirmed exactly as much, saying, "I believe so…if it was that big of a deal, it should have been articulated a lot sooner and handled a whole sooner." (*Id.*; Thompson Aff. Ex. E 38:2-7; *see also* Thompson Aff. Ex. D 78:2-13; Thompson Aff. Ex. C 62:3-64:2.)

Similarly, the other Defendants admitted the targets were of no concern and conceded they do not suffice to trigger any suspicion to legally arrest and attack Mr. Brown. (Thompson Aff. Ex. B 46:6-11; Thompson Aff. Ex. E 38:2-14; *see also* Thompson Aff. Ex. D 78:2-13; Thompson Aff. Ex. C 55:18-25, 56:1-5, 19-25, 58:6-25, 59:15-25, 60:13-25, 62:3-25, 63:1-2, 63:25-64:2.)

Defendants further admit that Mr. Brown's hand/pocket motion never created an actual suspicion that he was armed. (Thompson Aff. Ex. D 84:7-85:8.) Defendant Krueger confirmed that, regardless of the initial story, there was never truly any subjective belief that Mr. Brown had a weapon in his pocket:

Q.     So when he had his hands out of his pocket the first time, did he have a huge bulge in his pocket that looked like there was gun there, sir?
…
A.     I don't recall seeing a huge bulge.
Q.     Right. There was nothing about Mr. Brown's pockets or the way he had his hands in and out of his pockets that would ever leave you to suspect that he had a gun. Correct?
…
A.     There was nothing specific about his pockets that made me suspect he had a gun.
Q.     And so then you saw his hands out of his pockets. He didn't have a gun in his hands. Right?
A.     Correct.
Q.     And then when he put his hand into his pockets that didn't ever look like there was a gun there, certainly you weren't saying, "Oh, now he has a gun magically in his pocket." Correct?
A.     Correct.

(Thompson Aff. Ex. D 84:7-85:8.) This testimony tracks the controlling opinion of the Seventh Circuit which directs that the position of one's hands in relationship to their pockets is generally an irrelevant concern to police officers. *United States v. Williams*, 731 F.3d 678, 689 (7th Cir. 2013) ("[T]he simple fact that one's hands are in one's pockets is.... of little value. If one were to drive down any given street, it is likely that an uncountable number of citizens would have their hands in their pockets.").

Discovery further revealed that, without any *real* reason to arrest Mr. Brown, Defendant Krueger made one up. He told an interviewing officer he actually saw a gun in the back of Mr. Brown's car, and that seeing the gun made Mr. Brown agitated. (Thompson Aff. Ex. D 55-56.) This was a lie: in deposition, Defendant Krueger, upon review of his interview testimony admitted, "[i]t wasn't true." (Thompson Aff. Ex. D 56:10.)[4]

Regardless, Defendant Sergeant Krueger ultimately admitted that *he* was at fault for unnecessarily escalating the entire situation. (Thompson Aff. Ex. B 58:5-8.) The City of Milwaukee specifically criticized him for how he acted toward Mr. Brown in the Walgreen's parking lot:

> Q.   [In your report y]ou write, "Then he immediately asked why I was looking into his vehicle. I advised Brown to not walk up to an offier in the manner that he did." Right? That's what your report says?
> A.   Correct.
> Q.   There's no reference in your report [to the fact] that you told him the Supreme Court said you can look into anything. Right?
> A.   Correct.
> Q.   And the sergeant of internal affairs said if you used that language with him, he would be mad as hell or something to that effect?
> …
> A.   I believe that's correct.

(Thompson Aff. Ex. D 87:20-88:8.)

---

[4] Why was Krueger never disciplined for lying to the department in his PI-21?

This pattern of behavior supports one central conclusion: the entire defense on this issue was meritless since before this lawsuit was filed.[5]

D.     Excessive Force

Many Defendant Officers admit conduct which violates the Fourth Amendment's prohibition on excessive force. The Fourth Amendment guarantees citizens the right to be secure in their persons against unreasonable seizures. *Graham v. Connor*, 490 U.S. 386, 394, 109 S. Ct. 1865, 1871, 104 L.Ed.2d 443, 454 (1989). Whether or not any seizure is reasonable depends at least in part upon how it is carried out. *Tennessee v. Garner*, 471 U.S. 1, 8, 105 S. Ct. 1694, 1699, 85 L.Ed.2d 1, 8 (1985). To consider the reasonableness of any particular use of force, courts look to the following three factors identified by the *Graham* court:

- •     The severity of the crime;
- •     Whether the arrestee poses an immediate threat to the safety of the officers or others; and
- •     Whether the arrestee is actively resisting arrest or attempting to flee and evade arrest.

*Graham*, 490 U.S. at 396; *Abbott v. Sangamon Cty.*, 705 F.3d 706, 724-25 (7th Cir. 2013); *Abdullahi v. City of Madison*, 423 F.3d 763, 768 (7th Cir. 2005). Under the *Graham* factors, Defendants testimony would not support any use of force against Mr. Brown. The Defendants admitted as much. (Thompson Aff. Ex. B 34:14-17.) The officers' liability is not at issue nor has it ever actually been.

---

[5] Defendant Police Chief Morales, under oath, alleged that the Defendant Officers believed "Mr. BROWN was in possession of a firearm based upon the observation of shooting targets in the vehicle. Mr. BROWN was subsequently placed into custody after he refused to comply with a directive to remove his hands from his pockets and became resistive towards officers." (Thompson Aff. Ex. K, 2.)Mr. Brown now knows that all of this is false as the Chief knew or should have known. Defendants' own testimony thus undermines the basic facts at the foundation of Defendant Morales sworn statement. The Chief's failure to discipline the officers for their actual violations of Mr. Brown's constitutional rights is outrageous. "So the law becomes slack and justice never prevails." Habakkuk 1:4.

11

First, as to the severity of the crime, there was no crime in progress that the Defendants were policing. In fact, Defendant Grams said he just stopped to take "a piss," and was going to give Mr. Brown a warning ticket. (Thompson Aff. Ex. J 94:23-25.) Next, as to the threat posed by Mr. Brown, and as to whether he was resisting, a set of Defendant officers admitted that Mr. Brown's conduct created zero concern for their safety. (Thompson Aff. Ex. B 31:13-14 ("I didn't feel the threat level was as high as everybody seemed to make it"), 32:1-5, 32:6-8; Thompson Aff. Ex. F 57:1-5; Thompson Aff. Ex. C29:3-6 (confirming that no officer expressed any worry for safety), 86:17-20 (confirming that nothing Mr. Brown did made Defendant Samardzic believe he (Brown) was armed)). Defendant Andrade further confirmed that Mr. Brown never even acted aggressively towards any of the officers. (Thompson Aff. Ex. B 33:3-6 ("Q: it would be fair to say that while you were on the scene, you never saw Mr. Brown act aggressively toward any officer, correct? A: Yes, sir.")). As described above, while Sergeant Krueger and others made self-serving, convenient ex-post facto explanations for their conduct, they recanted those "explanations" in deposition.

Defendant Andrade explained that the officers faced no articulable threat from Mr. Brown:

> I didn't feel the threat level was as high as everybody seemed to make it… Obviously, I don't see the threat, high threat level, you know, release some officers there. I mean, that way you're not surrounding someone with ten cops. I mean, I'm a cop and I wouldn't want all these cops surrounding me.

(Thompson Aff. Ex. B 31:10-32:8.) Lest there be any confusion at all, he stated, "Like I explained earlier, the threat assessment was way down…**I didn't fear**." (Thompson Aff. Ex. B 33:1-2) (emphasis added).

In "remediation," the Defendant officers were specifically instructed by the Milwaukee Police Department that it was *because* of Sergeant Mahnke's and Sergeant Krueger's conduct that Mr. Brown was inappropriately grabbed, taken down, forced into submission, and ultimately tased

12

and booked. (Thompson Aff. Ex. B 50:1-12.) Sergeants Mahnke and Krueger used the targets in Mr. Brown's back seat as a pretext to for attacking him and they began questioning Mr. Brown about a gun. It was this questioning that then "alarmed the officers, [forcing] their guard back up, which in a sense made the situation even more of what it shouldn't have been." (Thompson Aff. Ex. B 49:14-24; *see also* Thompson Aff. Ex. C 60:2-19, 86:17-23.) Thus, anything that escalated the situation came from the sergeants' actions and <u>not</u> Mr. Brown's:

> Q.      [B]ut for Sergeant Mahnke's and Sergeant Krueger's escalation of this situation, you would never even have gone hands-on with Mr. Brown. Correct?
> A.      Correct.

(Thompson Aff. Ex. B 54:14-20.)

> Q.      And at the remedial training, it was pointed out that Sergeant Mahnke's and Sergeant Krueger's failure to deescalate the situation resulted in Mr. Brown's being arrested and tased. Correct.?
> …
> A.      Yes.

(Thompson Aff. Ex. E 38:9-14; see also Thompson Aff. Ex. D 51:17-25.) Sgt. Krueger even admits his failures *caused* Mr. Brown to be taken down and tased. (Thompson Aff. Ex. D 96:10-23, 97:15-98:5) ("It was definitely a part of the reason that the outcome was the way it was.") Defendant Collins admitted that *but for* Sergeant Mahnke's and Sergeant Krueger's escalation of the situation, he would have never even touched Mr. Brown. (Thompson Aff. Ex. E 38:21-25.) Defendant Samardzic also admitted that the only reason he stayed at the scene was to "protect the sergeants." (Thompson Aff. Ex. C 33:12-34:2.)

Nevertheless, Defendants *affirmatively* alleged in their answer that Mr. Brown's injuries from this event were "caused in whole or in part by [Mr. Brown's] own acts or omissions." (Dkt. 28 at 50.) The City's answer in this regard has been without merit at the outset and cannot be maintained; Defendants conclusively admitted in deposition that it was not Mr. Brown's "acts or

13

omissions," but rather, the unlawful actions of Defendants Krueger and Mahnke that caused the officers to attack, tackle, knee, taser and arrest Mr. Brown.

Defendant Collins' testimony clearly demonstrates that he applied excessive force to Mr. Brown. When he was asked about whether he kneed Mr. Brown in the groin, Defendant Collins disputed this characterization, and instead insisted that he administered perhaps two strikes of the knee to Mr. Brown's sternum. (Thompson Aff. Ex. E 42:10-25.) Such violent acts – strikes to the sternum – are recognized by some as *lethal* force.[6] Thus, Defendant Collins conceded that in response to a parking ticket, he (perhaps repeatedly) used deadly force on Mr. Brown. *Id.*

Such wanton behavior and callous indifference to the safety of citizens can have no place in the City of Milwaukee. Yet, testimony reveals this conduct is apparently endorsed by the Defendants. Defendant Collins carries a reputation in the Milwaukee Police Department for using excessive force. (Thompson Aff. Ex. B 62:10-63:4.) Defendant Collins has a history of violent behavior. A report written to then-acting Milwaukee Police Captain Kurt Leibold documented that, in a previous incident, "Officer Collins slam[med] [a woman's] head down and then put all of his weight on top of [her] while giving her four to five thrusts with his forearm stating before each thrust 'Don't you kick me, you fucking bitch." (Thompson Aff. Ex. E 17.) Even the Professional Performance Division of the Milwaukee Police Department had known for a long time of his propensity for chaos, identifying that "Officer Collins is a cocky officer and a ticking time bomb." *Id.* His now-acknowledged track record for violence is simply disturbing. *Id.* 17-20.

---

[6] Wisc. Dep't of Justice Law Enforcement Standards Bd., *Defensive and Arrest Tactics: A Training Guide for Law Enforcement Officers*, 55 (Apr. 2002); Monadnock Police Training Council, Inc., *Monadnock Baton Chart*, (1998); Worcester Police Dep't, *Policy & Procedure: Service Baton/Expandable Baton Guidelines*, No. 400.3, 2 (Apr. 13, 2007); Las Vegas Metropolitan Police Dep't, *Use of Force Policy*, 9; Las Vegas Metropolitan Police Dep't, *Use of Force Policy*, 5; *National Consensus Policy and Discussion Paper on Use of Force*, 2 (Oct. 2017); *National Consensus Policy and Discussion Paper on Use of Force*, 11 (Oct. 2017); U.S. Dep't of Justice, *Agreement with the City of Yonkers, New York*, 4 (Nov. 14, 2016); Mark S. Link, *Mechanically induced sudden death in chest wall impact (commotio cordis)*, 82 Progress in Biophysics & Molecular Biology 175-186 (2003).

14

In line with this reputation, it is undisputed that Defendant Collins, unjustifiably, had his boot on Mr. Brown's ankle. The Defendant officers were told by the City itself that this was an excessive or unreasonable use of force. (Thompson Aff. Ex. E 25:10-26:2; Thompson Aff. Ex. B 50:13-18; Thompson Aff. Ex. C 66:17-24, 100:22-101:12.) Defendant Collins admitted:

> Q.    And [standing on Mr. Brown's leg] was not reasonable use of force. Correct?
> …
> A.    That's what I was told, yes."

(Thompson Aff. Ex. E 26:22-27:4.) Defendant Collins did not deny that this was a Constitutional violation. (*Id.* at 26:4-8.)

Of course, Defendant Collins' mind was elsewhere that night. As Mr. Brown alleged in his complaint, Defendant Collins' was singing to himself "money money money" and later fell asleep on the job, while Mr. Brown was unconstitutionally detained. (Dkt. 1 ¶¶126, 129.) Notably, this is the one place where Defendants saw no need for a dispute - they never answered the complaint paragraph as to the latter issue, and thus admitted that Defendant Collins fell asleep while working shortly after violating Mr. Brown's constitutional rights. (Dkt. 28 ¶129.)[7] Defendant Collins explained that he was not actually disciplined for any excessive force violations, instead he was disciplined for the comments he made on his body camera about Mr. Brown. (Thompson Aff. Ex. E 53, 98, 99, 102) ("I was suspended because… I called him a douchebag.") Very curiously, and

---

[7] In light of recent news, this particular admission is noteworthy for additional reasons. According to THE MILWAUKEE JOURNAL SENTINEL, ten months *after* he was involved in the violation of Mr. Brown's civil rights, Defendant Collins left a "4-year old girl inside a van --- leaving her in a city lot overnight in 18-degree weather." Luthern, Ashley, THE MILWAUKEE JOURNAL SENTINEL, Milwaukee officer who left 4-year-old girl overnight in tow lot also involved in Sterling Brown arrest, October 1, 2019, available at https://www.jsonline.com/story/news/crime/2019/10/01/milwaukee-police-cop-bucks-arrest-also-left-girl-tow-lot/3825771002. According to the article, Defendant Collins is now on a 45-day suspension, but will still remain on the force. One is left to wonder how appropriate responses by the City of Milwaukee to Officer Collins' violent behavior would have prevented another tragedy and yet another claim against the City.

15

contrary to standard protocol, even this discipline was concealed from other portions of the department. (*Id*. at 100.)[8]

E.     Failure to Intervene

An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). The Milwaukee Police Department's Code of Conduct mandates that police officers "oppose, and if possible, prevent any violation of the Code of Conduct and report violations if they occur." (Thompson Aff. Ex. C 69:19-70:18.) Failing to intervene under the code of conduct is, under the letter of the Code, to be treated the same as if the member committed the violation." (Thompson Aff. Ex. C 71:24-72:13.) This should have obliged the Defendant officers to protect Mr. Brown. *Id*.

Defendant officers observed Mr. Brown being improperly surrounded, grabbed, taken down, tased, and stepped on, all in manner inconsistent with their Milwaukee Police Department training and the United States Constitution. (Thompson Aff. Ex. B 33:7-24; Thompson Aff. Ex. C 78:2-79:1.) Defendants Andrade and Samardzic both flatly admitted they failed to intervene to protect Mr. Brown's rights. (*Id*.)

Defendant Samardzic even conceded that he regrets his failure to take action to stop Defendant Collins from standing on Mr. Brown's leg. (Thompson Aff. Ex. C 103:4-6.) Defendant Andrade testified similarly, explaining that he too should have done something when Officer Collins was stepping on Mr. Brown's leg. (Thompson Aff. Ex. B 77:7-8.) He recognized his

---

[8] Similarly, the Defendant Officers were never made fully aware that Defendant Krueger was disciplined for conduct that "led to the escalation of force that concluded with eight officers using force and a citizen being tased." (Thompson Aff. Ex. C 158:20-160:19.)

affirmative duty to intervene to protect Mr. Brown's rights, as well as his own failure to do so, "I should have said something. There was other stuff going on, so… But, yeah, I should have." *Id*.[9]

F.     Cover Up

Mr. Brown's complaint alleged the body camera footage showed that Defendants Mahnke and Krueger – the sergeants on scene – along with Defendant Collins, began to conspire to protect themselves before they even left the parking lot. (Dkt 1. ¶¶105-130.) Defendants now acknowledge facts vindicating Mr. Brown's position.

Just as Mr. Brown alleged, Defendants admit that one of the Sergeants stated "[w]e're trying to protect ourselves," (or something similar).  (Thompson Aff. Ex. E 82:3-5, Thompson Aff. Ex. F 84:1-8.) They also admit Sergeant Mahnke expressed specific concern about a potential lawsuit addressing racism in the Milwaukee Police department. *Id*. at 82:15-83:1. Defendant Collins admitted from that moment the group was carefully orchestrating their plans to their own advantage. (Thompson Aff. Ex. E 90.) Incredibly, but fortunately for the citizens of Milwaukee, while this interaction was occurring, Defendants had no idea Defendant Collins' body camera was capturing their entire conversation. (Thompson Aff. Ex. F 83:3-22; Thompson Aff. Ex. D 21:19-22:2.) Even more shocking, they apparently thought their discussion about protecting themselves was "privileged" and were told in training that such conversations "should not be made public." (Thompson Aff. Ex. E 96:10-22.)

While they thought they were not on camera, these officers divvied up post-incident responsibilities in a manner completely inconsistent with their training and policy. Per the Milwaukee Police Department's standard operating procedures, any officer involved in a use of

---

[9] Regardless of this admission, Defendant Avila who admits he was only "inches away" from Defendant Collins when he put his boot on Mr. Brown's leg, insists he never saw this conduct and had no reason to intervene.(Thompson Aff. Ex. G 35, 36, 94.)

17

force incident – even for having 'one finger on the person' – may not conduct the investigation into the use of force. (Thompson Aff. Ex. F 42:6-11; Thompson Aff. Ex. E 71:15-22) In other words, for *any* use of force incident, the proper protocol is for the officer involved to "call for somebody of higher rank to file that report." (Thompson Aff. Ex. F42:6-11; Thompson Aff. Ex. D17:18-20.) However, the group determined that Sergeant Mahnke would prepare the use of force. (Thompson Aff. Ex. D 56:24-57:5.) Of course, Sergeant Mahnke used force during the night in question. He was responsible for the initial take down and for ordering the deployment of the taser by Defendant Samardzic. (Thompson Aff. Ex. F 77:23-25.) The same is true of Sgt. Krueger, he grabbed Mr. Brown, helping to initiate the attack. (Thompson Aff. Ex. D23:9-12.)

Neither sergeant should have prepared the use of force report. Yet, they both proceeded according to their plan, and Mahnke began to prepare the report. (Thompson Aff. Ex. D 16:10-16.) Mahnke and Krueger now claim that they did not realize at the time their conduct would be considered a 'use of force,' or, alternatively, that they did not even know what "use of force" means. (Thompson Aff. Ex. F 42:2-14; Thompson Aff. Ex. D 17:23-18:3, 19:1-5.) Most alarming Krueger admitted that *to this day* he does not know the definition of "use of force." (Thompson Aff. Ex. D 17:24-25) ("I don't know the exact definition of use of force.").

The outlines of this coverup continued to be revealed as depositions went on. In Defendant Grams' deposition it came to light that his report was specifically altered to portray Mr. Brown as more aggressive. In Defendant Grams' final report of the incident, he stated that "Brown was within arm's reach which caused me concern for my safety." (Thompson Aff. Ex. J 89:15-24.) Before issuing this *final* report, a draft was reviewed by Sergeant Cashaw.[10] (Thompson Aff. Ex.

---

[10] Notably, on the night in question, Sergeant Cashaw was the acting lieutenant, known colloquially as being 'in the chair.' Thompson Aff. Ex. J 90:13-19.. This means that at the time, Sergeant Cashaw *was in control of the entire district*. *Id*.

J 90:13-19.) Something happened to Defendant Grams' report after Sergeant Cashaw reviewed it. Unlike the final report, the *initial* report drafted by Defendant Grams (prior to Sergeant Cashaw's review) did not include the language "caused me concern for my safety." (Thompson Aff. Ex. J, 94:6-17.) This evidence shows how Milwaukee Police Department officers manufacture a story, in this case about Sterling Brown, and his alleged threat to officers on the scene. In other words, a cover up was underway.[11] Similarly, Defendant Samardzic never documented in his report that he pulled his gun at the time Mr. Brown was forcefully taken to the ground in front of his date. (Thompson Aff. Ex. C 88:24-90:5.)

The obfuscation did not end with doctored reports.

On May 25, 2018, Mr. Brown's counsel sent correspondence to, Defendant Chief Alfonso Morales and City Attorney Grant Langley. (Thompson Aff. Ex. B 71:2-14.) That correspondence requested, on behalf of Mr. Brown, that the Defendants preserve 'any and all evidence including all the Facebook and/or social media entries posted by the individual officers relating to this incident or to Mr. Brown as well as to any other use of force incident.' The law on spoliation is clear: "[s]poliation of evidence occurs when one party destroys evidence relevant to an issue in the case." *Smith v. United States*, 293 F.3d 984, 988 (7th Cir. 2002). Mr. Brown's lawsuit was filed a few weeks after the letter was sent to Defendant Morales and City Attorney Langley, on June 19, 2018. On the day the lawsuit was filed, Defendant Andrade scrubbed his entire facebook account. (Thompson Aff. Ex. B 71:19-24.) In the time between the May 25, 2018 letter and Defendant Andrade's destruction of his social media account, neither Defendant Morales, his representatives, nor any other City representative on notice contacted Defendant Andrade to inform him to preserve his social media accounts. (Thompson Aff. Ex. B 71:1-25.) What is more, Defendant Andrade

---

[11] Plaintiff's counsel will depose Sgt. Cashaw and will likely seek leave to amend the pleadings to add claims and defendants.

acknowledged he would have preserved this evidence had Defendant Morales or anyone else instructed him to preserve the relevant content. (Thompson Aff. Ex. B 73:11-20.) However, no one did, and now evidence is gone. Id. The Chief and others are responsible for the unlawful spoliation of evidence.

G.    The City of Milwaukee's *Monell* liability

In order to file a successful *Monell* claim, a plaintiff "must produce evidence of [either] '(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the final force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *Lewis v. City of Chicago*, 496 F.3d 645, 656 (7th Cir. 2007) (quoting *Phelan v. Cook Cnty*, 463 F.3d 773, 789 (7th Cir. 2006)).  The Seventh Circuit recognizes a fourth basis, whereby a *Monell* claim may be viable with a showing that a municipality's failure to train or discipline officers equaled a deliberate indifference to the constitutional rights of citizens. *Estate of Heenan v. City of Madison*, 111 F. Supp. 3d 929, 951 (W.D. Wis. 2015); *Estate of Fields v. Nawotka*, No. 03-CV-1450, 2008 U.S. Dist. LEXIS 27291, at *24-25 (E.D. Wis. Mar. 18, 2008).  Deliberate indifference occurs in one of two ways: (1) when the need for different training is obvious because of the likelihood that constitutional violations will occur; or (2) when the need for further training is obvious because a constitutional violation is so frequently repeated in spite of appropriate training. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1029 (7th Cir. 2006); *Green v. Newport*, No. 15-CV0786, 2017 U.S. Dist. LEXIS 25429, *20, 2017 WL 713899 (E.D. Wis. 2017).

Defendants have testified that no one, or nearly no one, has been disciplined by the City of Milwaukee for excessive force in their various tenures in the office. (Thompson Aff. Ex. H 25:9-

26:8.) Similarly, the Defendant Officers have testified that no one has been disciplined by the City of Milwaukee for racially-motivated conduct during their various tenures in the office. (Thompson Aff. Ex. G 88:25-89:3; Thompson Aff. Ex. B 63:5-12; Thompson Aff. Ex. D 104; Thompson Aff. Ex. E 57:3-7.)

The latter fact – that there has been no discipline for racially motivated conduct – is also forming the basis of a compelling *Monell* claim. Such claims for *Monell* liability have survived summary judgment in the Eastern District Court of Wisconsin. *See, e.g. Estate of Fields v. Nawotka*, No. 03-CV-1450, 2008 U.S. Dist. LEXIS 27291, at *24-25 (E.D. Wis. Mar. 18, 2008). Relatedly, the City represents that it is comfortable with a distorted proportion of use-of-force incidents among Milwaukee' population of color, simply because the inflated use-of-force rate corresponds (allegedly) to a similarly inflated arrest rate. (Thompson Aff. Ex. I 62:1-63:23.) Of course, this conclusion ignores an obvious problem, whereby people of color in the City of Milwaukee, particularly African Americans, are detained <u>and</u> subjected to use-of-force incidents at a rate vastly outpacing that of the white population. (*Id*.) <u>Also alarming, the City admitted that it has always carried the data that identifies police interactions by race but has not done anything to analyze that data up until this point</u>. (Thompson Aff. Ex. I 72-73.) Further, while the City obtains reports regarding use of force, those reports do not break down or evaluate how often the use of force constitutes the unlawful use of force.

Testimony regarding training has also proven illuminating. Indeed, it seems doubtful that the officers have entertained adequate training at all i.e. not only taught but tested and measured. The City of Milwaukee scheduled what it called a 'remediation' training for the officers involved in this incident with Mr. Brown. *See above*. Yet, many of the officers clearly learned nothing. <u>Indeed, Defendant Grams, who unlawfully triggered the entire incident, actually believes he should</u>

have used additional force and struck Mr. Brown directly in the sternum at the moment he made contact with him despite having been "trained" to the contrary! Additionally, Defendant Grams somehow believes he was told by the City at this "remediation," that he did everything properly. He explained:

> Q.  …What did they tell you was inappropriate about your contact with Mr. Brown?
> …
> A.  At the training, I don't think they said I did anything wrong. We talked about what happened on the body camera. What happened at the scene. But I don't believe…but I don't believe they ever said I did anything wrong. I'm the officer on the scene. I handled it the way I handled it. And I don't think I did anything wrong.

(Thompson Aff. Ex. J 117:3-16.) Defendant Grams continued:

> Q.  Let's be very clear. At the remedial training, what did they tell you about your pushing Mr. Brown?
> …
> A.  **Okay. Yeah, it should have been more forceful because in that training** – I mean, I tried to keep it from escalating; so I just pushed him with my fingers. **That training shows that you strike the person straight up in the chest very forcefully to actually move them back**…and I didn't do that. I didn't strike him like that, which I should have by the book…. Q. Who told you that at the remedial training, that you should have shoved him? A. Well, I don't know if anybody – I don't know if anybody told me that, but that's what the [Defense and Arrest Tactics] book says.
> Q.  My question, sir, was, what did they tell you at the remedial training about your contact with Mr. Brown?
> A.  I'm not sure if they addressed that or how they addressed it.

(Thompson Aff. Ex. J 121:17-122:21) (emphasis added). Defendant Grams maintains this position despite the fact he was required to undergo further "remediation" for ignoring the initial "remediation." (Thompson Aff. Ex. J 133:2-11, 149:1-7; see also Thompson Aff. Ex. B 57:7-22 ("[Grams] was like offended by it…like he didn't take the criticism properly").

The training deficiencies do not end here. Defendant Collins admits that he was trained by the City of Milwaukee that his conduct amounted to excessive force. He does not believe it. He explained:

> Q.  Okay. You were told it was unreasonable use of force. Correct?
> A.  Yes.
> Q.  But you don't believe that. …

A.      No.

(Thompson Aff. Ex. E 27:1-12, see also Thompson Aff. Ex. E 95:1-17.) Defendant Collins denies that the training he receives is even applicable to his police work. (Thompson Aff. Ex. E 54-55) ("Training is training.") Similarly, the "discipline" Defendant Collins received had no impact at all. He does not even remember going through a "policy review." (Thompson Aff. Ex. E 49-50) ("I barely even remember having a policy review. I don't remember the total concept of a policy review.") The same is true of Defendant Krueger, who admitted being instructed on "many examples" of deficient professional communication being used against Mr. Brown, yet as for a specific example he retreated, saying "I'm drawing a blank right now." (Thompson Aff. Ex. D 33:11-34:19.)

The issues and questions do not end there.

Defendants produced a video of a professional communications training that took place at the close of 2016. The video was bates stamped by the Defendants as MM-MPD SDB0003. In this video of a training session, a recruit instructor and veteran of the police force described the approaching changes with the advent of body worn camera videos. To explain the "threat" posed by this new technology, the trainer commented on her own experience with internal investigations in the Milwaukee Police Department. She stated that while she was an officer on the beat, she was investigated "about ten to twelve times by the internal affairs division of the Milwaukee Police. According to her, each and every time she faced investigation, she "walked out . . . squeaky clean," without having the allegations sustained.

In the video of the training she asks the officers in attendance why they believe she managed to evade any culpability from the internal affairs division. After receiving a couple of answers from the audience, she speaks frankly to the crowd.

"I lied. I lied. Every single time I went up there." She continued. "Guess what? I'll lie again. I am just being honest with you. I'll lie again."[12]
(Thompson Aff. ¶ 13.)

### H.    The Alleged Rule 68 Offer of Judgment

After forcing Mr. Brown through the ringer to discover all this information –information known or easily obtained by the City before the complaint was even filed, Defendants served the Plaintiff with an Offer of Judgment on September 24, 2019. (Thompson Aff. Ex. A.) Defendants represented that the offer was made pursuant to Rule 68. *Id.* Given these facts, Mr. Brown is left with no bona-fide choice but to deny the offer, as it would be against public policy to do otherwise.

<h3 align="center">ARGUMENT</h3>

Discovery unveiled that the Defendants knew they were responsible for a malicious invasion into Mr. Brown's constitutional rights just after the incident. Regardless, the City forced Mr. Brown to expend significant resources–attorneys fees, costs, and time–litigating this case to date to discover the information which has always been available and obvious to Defendants themselves. To put it bluntly, Defendants' answer in large part denied what they know they cannot deny in good faith. The truth is out–Defendants know they are liable for their conduct and admit as much. This is troubling for several reasons.

First, it shows Defendants were aware of their culpability while they waited for months *after* news of the incident broke to produce the body camera footage exculpating Mr. Brown. Mr. Brown now knows that while the body camera footage sat collecting dust in the offices of the Milwaukee Police Department and his reputation was taking a beating nationally, at least some of the Defendants, and many inside the department and the City, realized the Defendants had violated Mr. Brown's civil rights.

---

[12] This matter is the subject of discovery requests which are now overdue, upon receipt of additional documents, the officer's deposition will be taken.

Next, this testimony raises significant questions about the Defendants' litigation tactics. The City, on behalf of all Defendants, answered the operative complaint, denying all liability and casting blame on Mr. Brown. Mr. Brown now knows that when their Answer was filed, Defendants actually knew they were in the wrong.

Defendants are forcing a dispute when they *know* no dispute exists.[13] The result is unfairly prejudicial, wasting a year's worth of Mr. Brown's costs, attorney's fees, and time only to discover that Defendants have apparently been ready to admit many of these allegations all along as demonstrated above. Defendants know, and have known, they violated Mr. Brown's civil rights.

One must ask: Why? Why continue to dispute on paper that which the Defendants readily admitted in deposition? Why force everyone through all of this? Defendants' alleged Rule 68 Offer of Judgment provides an answer.

The legitimate purpose of Fed. R. Civ. Pro. 68 is to make plaintiffs "think very hard" about whether continued litigation is worthwhile. *Marek v. Chesny*, 473 U.S. 1, 11, 87 L. Ed. 2d 1, 105 S. Ct. 3012 (1985). Yet, by fabricating a defense and inflating the relevant costs and fees unnecessarily, Defendants offer, requiring him to now accept their continuing denial of responsibility, is against public policy and provides him with no real options to sincerely weigh or consider. Defendants simply want to have their cake and eat it too. Even though this offer gave Mr. Brown no bona fide choice in the matter (as the rule requires), Defendants seek to hoist the cost-shifting provisions of the rule to further threaten Mr. Brown. This is a transparent effort to distort the rules of civil procedure. It is an attack on the civil justice system which should not stand.

The first rule of civil procedure dictates that all rules of civil procedure should be construed with an eye for a just determination in every action or proceeding. Fed. R. Civ. P. 1. Defendant's

---

[13] The City will no doubt argue that there are at least issues of material fact as to its *Monell* liability.

manipulation of Rule 68 in this case is precisely why Rule 1 is crucial: it gives all involved a common-sense boundary for the way disputes are to be litigated in the United States. Correspondingly, Defendants should never be rewarded for asserting meritless defenses while boldly inflating a Plaintiff's litigations costs and fees, only to try to take advantage of serving an offer of judgment that Plaintiff could never accept in true conscience. Attempting to utilize the cost- shifting mechanism of Rule 68 onto the Plaintiff under these circumstances would be a miscarriage of justice and would only sanction Defendants' shenanigans in this case and encourage it in others.

The Supreme Court of the United States cautions that sham Rule 68 offers of judgment ought not be weaponized against Plaintiffs:

> If a plaintiff chooses to reject a reasonable offer, then it is fair that he not be allowed to shift the cost of continuing the litigation to the defendant in the event that his gamble produces an award that is less than or equal to the amount offered. But it is hardly fair or evenhanded to make the plaintiff's rejection of an utterly frivolous settlement offer a watershed event that transforms a prevailing defendant's right to costs in the discretion of the trial judge into an absolute right to recover the costs incurred after the offer was made.

*Delta Air Lines v. August*, 450 U.S. 346, 356, 101 S. Ct. 1146, 1152, 67 L.Ed.2d 287, 295 (1981). While the Seventh Circuit did not construe the *Delta Air Lines* decision to impart any reasonableness *requirement* onto Rule 68 Offers of Judgment, *Lentomyynti Oy v. Medivac, Inc.*, 997 F.2d 364, 368 (7th Cir. 1993), courts across the country have found opportunity to consider 'reasonableness' in the context of such offers. *Frigon v. DBA Holdings, Inc*., 346 N.J. Super. 352, 787 A.2d 966 (Super. Ct. App. Div. 2002) (indicating that Court of Appeals "reasonableness requirement" was, if anything, supported by the *Delta Air Lines* decision); *Black v. Roche Biomedical Labs., Div. of Hoffman-Laroche*, 315 S.C. 223, 226, 433 S.E.2d 21, 23 (Ct. App. 1993) (South Carolina Court of Appeals case applying the *Delta Air Lines* "reasonableness requirement" to find that, in medical malpractice case, a "$35,000.00 offer was unreasonable and made for

26

tactical purposes rather than to settle the case, and was not made in good faith as required by Rule 68); *Vaughn v. Cent. Miss. Credit Corp*. (In re Vaughn), Nos. 10-81836-WRS, 14-8010-WRS, 2016 Bankr. LEXIS 661, at *16 (Bankr. M.D. Ala. Mar. 3, 2016) (in dicta, indicating that an offer of $1 would be invalid).

Without explicitly referencing *Delta Air Lines*, the California Northern District Court found that Rule 68 carries a requisite good faith requirement:

> As discussed above, Rule 68 seeks to spur settlement and avoid litigation by "prompt[ing] both parties to a suit to evaluate the risks and costs of litigation, and to balance them against the likelihood of success upon trial on the merits." Marek, 473 U.S. at 1. To ensure that the goals of Rule 68 are being effectuated the Court evaluates whether the Offer appears to be made in good faith.

*Slovin v. Sunrun, Inc*., No. 15-CV-5340 YGR, 2017 U.S. Dist. LEXIS 105474, at *6 (N.D. Cal. July 7, 2017). The *Slovin* opinion determined that a FRCP 68 offer of $100,000 – far beyond the wildest damages dreams for a class representative in a FRCP 23 action – violated this good faith principle because it would undo the rights of the class claimants as protected by FRCP 23. Id. at 6-11.

Any principles of good faith are upset by Defendants' conduct here. As outlined above, the Defendants know they violated Mr. Brown's civil rights, but the City still forced Mr. Brown to entertain 16 months of litigation and fees to uncover the truth; a truth known to the defendants at all times. Defendants served this offer only *after* forcing the plaintiff to take a multitude of depositions and discover thousands of pages of documents. Much of this could have been avoided if Defendants simply answered the complaint truthfully and consistent with their deposition testimony. Rather than be forthright with the Plaintiff, the Court and the people of Milwaukee, the City's defense has done everything possible to penalize Mr. Brown and conceal the truth. Plaintiff is left with a Rule 68 Offer of Judgment that gives him nothing to truly consider. The City's

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 27 of 30   Document 59

conduct compromised Plaintiff's bottom line *before* serving their low-ball offer. As Alderman Mark Borkowski told the press after the vote authorizing the City's "offer," Mr. Brown's damages and losses could actually be "much, much more." (Dirr, Alison, THE MILWAUKEE JOURNAL SENTINEL, Common Council approves $400,000 settlement offer to Bucks guard Sterling Brown, Sept 4, 2019, available at https://www.jsonline.com/story/news/local/milwaukee/2019/09/04/milwaukee-council-oks-400-000-settlement-offer-sterling-brown/2207822001/.) As a result, the relevant Rule 68 offer of judgment is no sincere offer at all – its simply a litigation tactic designed to threaten to shift the costs of litigation onto the plaintiff without ever truly exposing the Defendant to the risk that a judgment would be entered, thereby concealing the truth from the public. This conduct is at odds with our rules of procedure.

To that point, the language of the offer shows how the Defendants are still seeking to continue to obscure their nefarious conduct from the light of day. The Defendants' offer, made on behalf of each defendant in the case, only permits judgment, i.e. a legal finding of liability, to be entered against the City of Milwaukee. Under this arrangement, the City of Milwaukee would again shield their constitutionally-deficient officers from any sort of actual course correction. This is reprehensible in light of the latest news involving Defendant Collins, who Defendants never disciplined for excessive force in this case and was allowed to violate a four-year-old's rights. It appears that the City of Milwaukee will stop at nothing to shield its officers from bona fide discipline, even at the expense and safety of the citizens of Milwaukee. As the recent case of Defendant Collins suggests, public safety is compromised because of how aggressively Defendants work to conceal their misdeeds. This should not be rewarded by this Court. [14]

---

[14] The Hon. Judge Barbara Crabb has commented that unfiled Rule 68 Offers of Judgment are not pending before the court, and are thus beyond the scope of any motion to strike. *Wilder Chiropractic, Inc. v. Pizza Hut of S. Wis., Inc.*,

28

After releasing the body camera footage that exculpated Mr. Brown for the incident in question, the City responded publicly to the circumstances surrounding the attack Mr. Brown was exposed to in a Walgreens parking lot. The Mayor offered his apologies, saying "as a human being I am offended by what I saw on the video. As mayor I am committed to improving police-community relations." He later commented that "I apologized to Mr. Brown. It was not the way our police officers should have treated him." Defendant Police Chief Morales also apologized, but not to Mr. Brown. Instead he expressed regret about the incident at large, without acknowledging the culpability of his officers. "I am sorry this incident escalated to this level," he said.[15] Associated Press, for LOS ANGELES TIMES, May 23, 2018, available at https://www.latimes.com/nation/nationnow/la-na-milwaukee-chief-apologizes-sterling-brown-20180523-story.html. The City Attorney's office publicly responded to the public furor over the

---

754 F. Supp. 2d 1009, 1013 (W.D. Wis. 2010) ("In any event, I agree with those courts that have held "that there is nothing to strike" because "a Rule 68 offer is not filed until it is accepted or until it is presented to the court when the defendant seeks to recover costs.") Plaintiff believes that the instant situation is distinguishable, and compels court action. First, district courts carry inherent powers to "impose silence, respect, and decorum, in their presence, and submission to their lawful mandates." *Chambers v. NASCO, Inc*., 501 U.S. 32, 43, 111 S. Ct. 2123, 2132, 115 L.Ed.2d 27, 44 (1991). Federal district courts have invoked this inherent power to consider unfiled Rule 68 Offers of Judgment *U.S. Bank Nat. Ass'n*, 276 F.R.D. 330, 336 (D. Minn. 2011). In *U.S. Bank Nat. Ass'n*, the court invoked its inherent authority in the interest of protecting class claimants whose claims would be adjudicated through an offer of judgment sent to a class representative. *Id*. The situation here is similar. Defendants admitted conduct, in failing to discipline or train its officers' properly exposes the Citizens of Milwaukee to the threat of real harm. See e.g. Luthern, Ashley, THE MILWAUKEE JOURNAL SENTINEL, Milwaukee officer who left 4-year-old girl overnight in tow lot also involved in Sterling Brown arrest, October 1, 2019, available at https://www.jsonline.com/story/news/crime/2019/10/01/milwaukee-police-cop-bucks-arrest-also-left-girl-tow-lot/3825771002. Defendants continued efforts to deny, delay, and distort has resulted in painful consequences for a young girl. Permitting this strategy to continue unabated exposes the people of Milwaukee to additional harm. By invoking the court's inherent authority the rights of Milwaukee citizens can be protected and future harm can be avoided. Thus, Plaintiff respectfully requests that this court consider his Motion to Strike and grant it on its merits.

[15] "Ask a white person about these moments and often the veil falls. Their moral turpitude lies naked and ashamed. Bewildered at the idea that they might have something asked of them to disrupt the hideous truth. This is what you are surrounded by. Silent witnesses.
Liberals, 'the good guys,' of all stripes gnash their teeth at such truths, and smiles turn to bitter curls, which makes them ever more dangerous. This problem dwarfs partisanship and smug decency. It is constitutional." Imani Perry, Breathe A Letter To My Sons, p. 9 (Beacon Press 2019).
Mr. Brown deserves more than a mere apology. He, as any human being, citizen of the United States of America, is entitled to an express vindication that his constitutional rights have been violated. He is entitled to no less.

language of its Answer. That statement represented that the Answer "was… absolutely necessary if our clients must seek to have a judge and jury determine whether Mr. Brown's rights under the United States Constitution were violated." See Sanchez, Angelica FOX6NOW, *Sterling Brown's attorney calls city's 51-page response to lawsuit, which blames Brown, an 'absurd accusation,'* August 28, 2018 available at https://fox6now.com/2018/08/28/milwaukees-city-attorney-files-51-page-response-to-sterling-brown-lawsuit/, response by the City Attorney's office reproduced therein, available at https://localtvwiti.files.wordpress.com/2018/08/statement-to-the-press-in-sterling-brown-matter.pdf. This statement was released nearly two months *after* the defendants had been directly trained that their conduct violated Mr. Brown's rights. In light of the defendant officer's testimony, this statement is quite revealing. Why is the City forcing Mr. Brown to endure this all unnecessarily?

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiff respectfully requests that the Defendant's Offer of Judgment be stricken, or otherwise ordered invalid under this Court's inherent authority.

Dated at Milwaukee, Wisconsin this 8th day of October, 2019.

> Respectfully Submitted:
> GINGRAS, THOMSEN & WACHS, LLP
>
> /s/ Mark L. Thomsen
> Mark L. Thomsen
> State Bar No.: 1018839
> Scott B. Thompson
> State Bar No.: 1098161
> William F. Sulton
> State Bar No.: 1070600
> 219 N. Milwaukee St., Suite 330
> Milwaukee, WI 53202
> Telephone: (414) 935-5482
> Email: mthomsen@gtwlawyers.com

30