UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

-----------------------------------------------------------

STERLING D. BROWN,

   Plaintiff,

  -vs-

CITY OF MILWAUKEE, CITY OF  Case No. 2:18-cv-922
MILWAUKEE CHIEF OF POLICE
ALFONSO MORALES, in his
official capacity, SERGEANT
SEAN A. MAHNKE, SERGEANT
JEFFREY S. KRUEGER, OFFICER
JOSEPH J. GRAMS, OFFICER BOJAN
SAMARDZIC, OFFICER JAMES P.
COLLINS, OFFICER CRISTOBAL
MARTINEZ AVILA, OFFICER ERIK A.
ANDRADE, and OFFICER JASON P.
JENSEN,

   Defendants.

-----------------------------------------------------------

   Video Examination of SERGEANT JEFFREY KRUEGER,

taken at the instance of the Plaintiff, under and

pursuant to the Federal Rules of Civil Procedure, before

KARA D. SHAWHAN, a Certified Realtime Reporter,

Registered Merit Reporter and Notary Public in and for

the State of Wisconsin, at City of Milwaukee, Office of

City Attorney, 841 North Broadway, Milwaukee, Wisconsin,

on May 31, 2019, commencing at 9:31 a.m. and concluding

at 12:54 p.m.

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 1 of 42   Document 60-4

1                    A P P E A R A N C E S

2      GINGRAS, CATES & WACHS, by
       MR. MARK L. THOMSEN,
3      MR. SCOTT THOMPSON,
       3228 Turnberry Oak Drive,
4      Waukesha, Wisconsin 53188,
       appeared on behalf of the Plaintiff.
5
       CITY OF MILWAUKEE,
6      OFFICE OF CITY ATTORNEY, by
       MS. NAOMI GEHLING,
7      200 East Wells Street, Room 800,
       Milwaukee, Wisconsin 53202,
8      appeared on behalf of the Defendants.

9                  A L S O   P R E S E N T

10     Ms. Stephanie Olson, Videographer.

11                    * * * * *
                    I N D E X
12

13     Examination:                              Page

14     By Mr. Thomsen.................................  4

15
       Exhibits Identified:                       Page
16
       Exhibit 107 - PI-21 Transcript....................  6
17     Exhibit 108 - Basic Law Enforcement Officer
                     Transcript.......................... 65
18     Exhibit 109 - Milwaukee Police Department
                     Investigation Employee Case File
19                   History............................ 69
       Exhibit 110 - Memorandum Regarding Policy Review... 71
20     Exhibit 111 - Memorandum.......................... 74
       Exhibit 112 - Statement........................... 85
21     Exhibit 113 - Report Draft........................ 90
       Exhibit 114 - Complaint........................... 96
22     Exhibit 115 - Discipline Review Summary........... 97
       Exhibit 116 - Memo From Sergeant Hines to Captain
23                   Kavanagh Dated November 27, 2018..... 98

24

25

1                    * * * * *

2    Disposition Of Original Exhibit/s:

3    Attached To Original Transcript

4                    * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

09:44   1          constitutional rights were violated on that night?

09:44   2     A    No.

09:44   3     Q    We were talking about the last time that you

09:44   4          reviewed the body cam, and you had mentioned it was

09:44   5          during the remedial training.  Correct?

09:44   6               MS. GEHLING:  Objection, mischaracterizes

09:44   7          his testimony.

09:45   8               THE WITNESS:  The last time I watched the

09:45   9          body cam was in July.

09:45   10    BY MR. THOMSEN:

09:45   11    Q    No.  I know.  But when we were talking, you had

09:45   12         said that it was in June -- at the remedial

09:45   13         training, then you recalled that there was one in

09:45   14         July.  Correct?

09:45   15    A    That's correct.

09:45   16    Q    Okay.  And I just -- For purposes of reference, I

09:45   17         want to go back to that earlier discussion.  Okay?

09:45   18         I understand that that was -- Strike that.  Was

09:45   19         that the first time you'd ever seen any body cam?

09:45   20               MS. GEHLING:  Objection, vague.

09:45   21    BY MR. THOMSEN:

09:45   22    Q    Well, put it this way.  I'm not asking about the

09:45   23         body cam of anybody else.  Okay?  So I'm talking

09:45   24         about -- When I ask whether you've watched body

09:45   25         cam, I want to know whether you've watched body cam

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 4 of 42   Document 60-4

09:45    1          footage involving Mr. Brown at any time before the

09:45    2          remedial training.

09:45    3     A    Yes.

09:45    4     Q    So let's go through each instance that you watched

09:45    5          the body cam just so I can get them in a list.

09:46    6          Fair enough?

09:46    7     A    Yes.

09:46    8     Q    Okay.  First time?

09:46    9     A    I watched bits of it when I downloaded it -- or

09:46   10          uploaded it.  It would be January 26, 2018.

09:46   11     Q    Okay.

09:46   12     A    And then during my first PI-21.

09:46   13     Q    Okay.  That was --

09:46   14                MS. GEHLING:  It doesn't say.

09:46   15                MR. THOMSEN:  Hmm?

09:46   16                MS. GEHLING:  It doesn't say.

09:46   17                MR. THOMSEN:  I know.

09:46   18     BY MR. THOMSEN:

09:46   19     Q    The PI-21 -- 107 doesn't have the date of the

09:46   20          PI-21, nor does it mention who was asking you

09:46   21          questions.  Correct?

09:46   22     A    Correct.

09:46   23     Q    Okay.  So who was asking you the questions?

09:46   24     A    Sergeant -- I know his last name.  I don't -- I

09:47   25          don't know how to say, if it's Erwin or Irvin, but

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 5 of 42   Document 60-4

09:47  1          it's Sergeant Estacio.

09:47  2                  MS. GEHLING:  It's E-s-t-a-c-i-o.

09:47  3   BY MR. THOMSEN:

09:47  4   Q    And do you recall the date?

09:47  5   A    No.  The exact date?  No.

09:47  6   Q    I believe Officer Grams' PI-21 was the same date of

09:47  7        the incident.  Was yours that quick, or was it the

09:47  8        next day?  Or don't you -- We'll have to track it

09:47  9        down.

09:47  10  A    We're -- If you get a PI-21, you are served with

09:47  11       it, and then you have seven days or ten days to

09:47  12       call your union, and then they set up the meeting.

09:47  13       So I was served with the PI-21 that -- Friday

09:47  14       night, but my PI-21 was a week or two after.

09:48  15  Q    Let's -- Okay.  So the second time you saw body cam

09:48  16       of your involvement with Mr. Brown was your PI-21.

09:48  17       The next time?

09:48  18  A    Correct.

09:48  19  Q    And the next time after that?

09:48  20  A    The remedial training.

09:48  21  Q    And then the next time after that was the second

09:48  22       PI-21 in July?

09:48  23  A    Correct.

09:48  24  Q    Correct?  Okay.  And have you reviewed any body cam

09:48  25       involving this incident since that?

Case 2:18-cv-00922-PP  Filed 10/08/19  Page 6 of 42  Document 60-4

09:48   1    A    No.

09:49   2    Q    Going back to the first time you looked when you

09:49   3         were downloading it, what do you recall about the

09:49   4         body cam that you were watching as you downloaded

09:49   5         it on the 26th?

09:49   6    A    I was -- I would click on a file, open it to see if

09:49   7         it was involving the incident, and then I would

09:49   8         mark it for download.  I didn't sit there to watch

09:49   9         the content of the video.

09:49   10   Q    Okay.  Did you watch any of the content of any of

09:49   11        the video?

09:49   12   A    Only to make sure that it was part of the incident

09:49   13        and not another call, because the body cam video

09:49   14        was not marked yet with the label of the incident,

09:49   15        so you have to manually go open up the video, look

09:50   16        at it, be like, "Okay.  That's part of the

09:50   17        incident," close it, and click it for upload.

09:50   18   Q    Okay.  Did you do the upload of all the body cams?

09:50   19   A    No.

09:50   20   Q    Do you recall which body cams you did, in fact,

09:50   21        upload?

09:50   22   A    No.

09:50   23   Q    The -- Was there any editing or deletions made in

09:50   24        any of the body cam that you uploaded?

09:50   25   A    No.

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 7 of 42   Document 60-4

09:50  1    Q    Is it possible to do that type of editing on an

09:50  2         upload?

09:50  3                   MS. GEHLING:  Objection, foundation,

09:50  4         calls for speculation.

09:50  5                   THE WITNESS:  I can't do it.

09:50  6    BY MR. THOMSEN:

09:50  7    Q    So the first time it was simply to -- Strike that.

09:50  8         My assumption is that you were given the assignment

09:51  9         to upload certain body cams?

09:51  10   A    That was my assignment, yes, that night to help out

09:51  11        Sergeant Mahnke, who was conducting the use of

09:51  12        force.

09:51  13   Q    Now, Sergeant Mahnke was not supposed to be

09:51  14        conducting the use of force investigation.

09:51  15        Correct?

09:51  16   A    It was later determined that he would not be.

09:51  17   Q    At the time he started, he knew that the policy was

09:51  18        if you were involved in the incident, you should

09:51  19        not conduct the investigation into the use of

09:51  20        force.  Correct?

09:51  21                   MS. GEHLING:  Objection, argumentative,

09:51  22        foundation, calls for speculation.

09:51  23                   THE WITNESS:  I don't know what he knew

09:51  24        at the time.

09:51  25   BY MR. THOMSEN:

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 8 of 42   Document 60-4

| | | |
|--|--|--|
| 09:51 | 1 | Q  I'm not asking what he knew, sir.  I'm asking you |
| 09:51 | 2 | what you knew as a sergeant.  Are you with me? |
| 09:52 | 3 | A  I'm confused as to what your question is. |
| 09:52 | 4 | Q  That's fair then.  Just tell me.  Okay? |
| 09:52 | 5 | A  I will. |
| 09:52 | 6 | Q  As a sergeant, you knew that if you were involved |
| 09:52 | 7 | in an incident, you needed to contact someone else |
| 09:52 | 8 | to conduct the use of force.  Correct? |
| 09:52 | 9 | MS. GEHLING:  Objection, argumentative. |
| 09:52 | 10 | BY MR. THOMSEN: |
| 09:52 | 11 | Q  Conduct the use of force investigation.  Correct? |
| 09:52 | 12 | A  Yes.  If, as a sergeant, you use force, you contact |
| 09:52 | 13 | somebody else. |
| 09:52 | 14 | Q  Okay.  Because the policy in the department is if |
| 09:52 | 15 | you were involved in the incident, you could not |
| 09:52 | 16 | conduct the investigation into the incident. |
| 09:52 | 17 | Correct? |
| 09:52 | 18 | A  I believe it's not that black and white.  If you |
| 09:52 | 19 | are involved in using force, then you call for |
| 09:53 | 20 | somebody of a higher rank. |
| 09:53 | 21 | Q  It's that black and white. |
| 09:53 | 22 | A  If you are involved in the use of force, yes. |
| 09:53 | 23 | Q  And what is the definition of "use of force"? |
| 09:53 | 24 | A  I don't know the exact definition of "use of |
| 09:53 | 25 | force."  My summary of a use of force, if -- I |

09:53    1          mean, there's different types of use of force.  If

09:53    2          -- I mean, I'm kind of repeating myself.  If force

09:54    3          is used, then it's a use of force.

09:54    4     Q    When you grabbed Mr. Brown, that was using force.

09:54    5          Correct?

09:54    6                    MS. GEHLING:  Objection, argumentative.

09:54    7                    THE WITNESS:  Merely taking hold of a

09:54    8          person I do not consider use of force.

09:54    9     BY MR. THOMSEN:

09:54   10     Q    If you take hold of someone and they end up being

09:54   11          on the ground and you're part of that, and they're

09:54   12          being tased, that's a use of force.  Correct?

09:54   13                    MS. GEHLING:  Objection, argumentative,

09:54   14          also compound.

09:54   15                    THE WITNESS:  If you're holding on to

09:54   16          somebody, it doesn't necessarily mean that you are

09:54   17          the one that took him to the ground.

09:54   18     BY MR. THOMSEN:

09:54   19     Q    Well, let's just be blunt then.  You were a

09:54   20          sergeant at the scene.  Correct?

09:54   21     A    Correct.

09:54   22     Q    You knew that your involvement in that scene

09:55   23          precluded you from conducting the investigation

09:55   24          into the use of force.  Correct?

09:55   25                    MS. GEHLING:  Objection, argumentative.

09:55   1           THE WITNESS:  At the time of the incident
09:55   2       that night we didn't believe that we were the ones
09:55   3       that used force.  We were a part of the situation
09:55   4       or incident, but we -- or I didn't feel that my
09:55   5       actions took him to the ground.
09:55   6   BY MR. THOMSEN:
09:55   7   Q   Did you believe you had the right to conduct the
09:55   8       investigation into your use of force?
09:55   9           MS. GEHLING:  Objection, argumentative
09:55  10       and mischaracterizes his testimony.
09:55  11           THE WITNESS:  I'm sorry.  Could you
09:55  12       repeat it?
09:55  13   BY MR. THOMSEN:
09:55  14   Q   The court reporter will read it back.
09:55  15           (Record read.)
09:56  16           THE WITNESS:  No.
09:56  17   BY MR. THOMSEN:
09:56  18   Q   Okay.  I know that you can't get into Sergeant
09:56  19       Mahnke's head, but when you were in the car and you
09:56  20       were aware that he was starting to conduct the
09:56  21       investigation, why did you not tell him to stop
09:56  22       because he knew it was wrong for him to conduct
09:56  23       this use of force investigation?
09:56  24           MS. GEHLING:  Objection, argumentative,
09:56  25       foundation, calls for speculation, and also I think

09:56   1        mischaracterizes his testimony.

09:56   2               THE WITNESS:  Can you -- I'm sorry.

09:57   3               (Record read.)

09:57   4               THE WITNESS:  I didn't know he knew it

09:57   5        was wrong.

09:57   6   BY MR. THOMSEN:

09:57   7   Q    He'd been a sergeant longer than you.  Right?

09:57   8   A    Correct.

09:57   9               MS. GEHLING:  Objection, foundation.  Go

09:57   10       ahead.

09:57   11  BY MR. THOMSEN:

09:57   12  Q    Right?

09:57   13  A    Yes.

09:57   14  Q    And as a sergeant, working with a sergeant that has

09:57   15       been doing it longer than you and you knew, why

09:57   16       would you even think that?

09:57   17               MS. GEHLING:  Objection, argumentative,

09:57   18       vague.

09:57   19               THE WITNESS:  At the time of the incident

09:57   20       -- And maybe I didn't state this correctly.  At the

09:57   21       time of the incident or that night, I didn't know

09:57   22       that it was wrong.  I believed that we had not used

09:57   23       force.

09:57   24  BY MR. THOMSEN:

09:58   25  Q    See, this is what I'm trying to figure out,

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 12 of 42   Document 60-4

09:58  1    Sergeant.  If you are in the vehicle with Sergeant

09:58  2    Mahnke after a young African American male is taken

09:58  3    to the ground and tased for a parking -- alleged

09:58  4    parking violation and you know that you can't

09:58  5    conduct the investigation into the use of force and

09:58  6    then you say to Sergeant Mahnke and Officer

09:58  7    Collins, "We are trying to protect ourselves," it

09:58  8    seems to me that maybe that's why you didn't object

09:58  9    to Sergeant Mahnke conducting it.

09:58  10            MS. GEHLING:  Is there a question?

09:58  11   BY MR. THOMSEN:

09:58  12   Q    Certainly that's a possible explanation.  Correct?

09:59  13            MS. GEHLING:  Objection, argumentative,

09:59  14       foundation, calls for speculation, mischaracterizes

09:59  15       testimony, and brings in facts that have not been

09:59  16       testified to.  Please answer if you can.

09:59  17            THE WITNESS:  No.

09:59  18   BY MR. THOMSEN:

09:59  19   Q    Okay.  You know, when you said, "We're protecting

09:59  20       ourselves," you did not know you were on body cam.

09:59  21       Correct?

09:59  22            MS. GEHLING:  Objection, argumentative.

09:59  23            THE WITNESS:  No, I did not.

09:59  24   BY MR. THOMSEN:

09:59  25   Q    You didn't know that there was a mic picking

Case 2:18-cv-00922-PP  Filed 10/08/19  Page 13 of 42  Document 60-4

09:59   1        everything up.  Correct?

09:59   2    A   Correct.

09:59   3    Q   Okay.  Your code of conduct requires you to report

09:59   4        unlawful or improper conduct by a fellow officer.

09:59   5        Correct?

09:59   6    A   Correct.

09:59   7    Q   Did you ever report that Sergeant Mahnke was

09:59   8        improperly conducting the use of force

09:59   9        investigation to anyone?

10:00  10            MS. GEHLING:  Objection, argumentative

10:00  11        and mischaracterizes prior testimony.

10:00  12            THE WITNESS:  I didn't believe that he

10:00  13        was -- I forgot your exact wording.  I don't know

10:00  14        if you can read it back or --

10:00  15            (Record read.)

10:00  16            THE WITNESS:  At the time of the

10:00  17        incident, I did not believe that he was improperly

10:00  18        reporting it.

10:00  19    BY MR. THOMSEN:

10:00  20    Q   And please tell the jury why.

10:00  21            MS. GEHLING:  Objection, asked and

10:00  22        answered, but answer again.

10:00  23            THE WITNESS:  I'm sorry.  At the time I

10:00  24        didn't believe that myself or Sergeant Mahnke had

10:00  25        used force.

10:00    1    BY MR. THOMSEN:

10:00    2    Q    What do you believe you had done with respect to

10:00    3         Mr. Brown?

10:01    4    A    I believe -- or I at the time felt that I was just

10:01    5         controlling his arm.

10:01    6    Q    And when you say you were "controlling his arm,"

10:01    7         did you have one or two hands on his arm?

10:01    8    A    Two.

10:01    9    Q    And were you squeezing it -- Strike that.  Were you

10:01   10         using both hands to squeeze his arm?

10:01   11    A    I don't know if I would characterize it as

10:01   12         "squeezing."  I was grabbing ahold of it.

10:02   13    Q    So you've got a water bottle in front of you.

10:02   14         Right?  Why don't you show the jury how you were

10:02   15         holding Mr. Brown's arm.

10:02   16    A    I believe it was like this.

10:02   17    Q    Just like that.  No force?

10:02   18    A    Sir, it's a water bottle.

10:02   19              MS. GEHLING:  Objection, argumentative.

10:02   20    BY MR. THOMSEN:

10:02   21    Q    Well, that's my point.  What do you mean, "It's a

10:02   22         water bottle"?

10:02   23    A    I don't recall how hard I held on to his arm.

10:02   24    Q    I wanted that because it is a water bottle, and if

10:02   25         you were grabbing it, I'm assuming that you would

10:14   1   A   I don't recall if it was played at the remedial

10:14   2       training or not.

10:14   3   Q   Do you -- As you're sitting here, do you remember

10:14   4       any portions of Officer Avila's body cam that you

10:14   5       reviewed during your first PI-21?

10:14   6   A   In general, I remember it, but maybe not specific

10:14   7       or -- I mean, in general, I remember it.

10:14   8   Q   Do you recall witnessing events that were

10:15   9       inconsistent with training provided by the

10:15   10      department?

10:15   11              MS. GEHLING:  Objection, vague.

10:15   12              THE WITNESS:  Could you just read -- I'm

10:15   13      sorry.

10:15   14              (Record read.)

10:15   15              THE WITNESS:  No, I do not recall.

10:15   16  BY MR. THOMSEN:

10:15   17  Q   Now, you watched a lot of body cam footage at the

10:15   18      remedial training in June of 2018.  Correct?

10:15   19  A   Yes.

10:15   20  Q   And you recall the first video that you watched at

10:15   21      the remedial training would have been body cam

10:16   22      footage from Officer Grams' body camera?

10:16   23              MS. GEHLING:  Objection, foundation.

10:16   24              THE WITNESS:  Yes.

10:16   25  BY MR. THOMSEN:

```
10:24    1    BY MR. THOMSEN:
10:24    2    Q    What were the officers told went wrong?
10:24    3              MS. GEHLING:  Objection, vague.  Please
10:24    4         answer.
10:24    5              THE WITNESS:  It was about professional
10:24    6         communication.
10:24    7    BY MR. THOMSEN:
10:24    8    Q    So what about professional communication was wrong?
10:24    9    A    There was many examples where it wasn't used in
10:24   10         this incident.
10:24   11    Q    Let's go through all these many examples where
10:24   12         professional communication was not used in this
10:25   13         incident with Sterling Brown.  Go ahead.
10:25   14    A    I'm sorry.
10:25   15    Q    You said there were many examples.
10:25   16    A    Oh.  Okay.
10:25   17    Q    Right?
10:25   18    A    Correct.
10:25   19    Q    Okay.  Tell the jury what all those examples are.
10:25   20    A    Okay.
10:25   21    Q    When I ask a question, please just answer.
10:25   22              MS. GEHLING:  He's waiting for me to
10:25   23         object.  I told him to give me a minute to get my
10:25   24         objections in.
10:25   25              MR. THOMSEN:  Fair enough.
```

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 17 of 42   Document 60-4

| | | |
|---|---|---|
| 10:25 | 1 | THE WITNESS:  Officer Grams -- how he |
| 10:25 | 2 | spoke to Mr. Brown. |
| 10:25 | 3 | BY MR. THOMSEN: |
| 10:25 | 4 | Q    Okay.  What else? |
| 10:25 | 5 | A    How my discussion with Mr. Brown went. |
| 10:26 | 6 | Q    So what was wrong with your discussion with |
| 10:26 | 7 | Mr. Brown? |
| 10:26 | 8 | MS. GEHLING:  Objection, mischaracterizes |
| 10:26 | 9 | his testimony. |
| 10:26 | 10 | THE WITNESS:  It wasn't very |
| 10:26 | 11 | professional. |
| 10:26 | 12 | BY MR. THOMSEN: |
| 10:26 | 13 | Q    So tell the jury how your communications with |
| 10:26 | 14 | Sterling Brown on January 26, 2018, was not |
| 10:26 | 15 | professional. |
| 10:26 | 16 | A    I became frustrated, and that caused me to say, |
| 10:26 | 17 | like, "You know, you're bothering me."  So -- |
| 10:26 | 18 | Q    What else? |
| 10:27 | 19 | A    I'm sorry.  I'm drawing a blank right now. |
| 10:27 | 20 | Q    It's okay.  Take your time. |
| 10:27 | 21 | A    I just -- I think the overall demeanor that I had, |
| 10:27 | 22 | we talked about that. |
| 10:27 | 23 | Q    What about your overall demeanor was inappropriate, |
| 10:27 | 24 | sir? |
| 10:27 | 25 | MS. GEHLING:  Objection, mischaracterizes |

Case 2:18-cv-00922-PP  Filed 10/08/19  Page 18 of 42  Document 60-4

10:27   1          his testimony.

10:27   2                  THE WITNESS:  It wasn't -- my overall --

10:27   3          Well, my demeanor was not professional.

10:27   4     BY MR. THOMSEN:

10:28   5     Q    In what way, sir?

10:28   6     A    Well, how I talked to him.

10:28   7     Q    And please explain to the jury the details of that.

10:28   8     A    Well, I told him he was bothering me, and that's

10:28   9          the biggest one that sticks out to me.

10:28   10    Q    You threatened to tow his truck -- I mean tow his

10:28   11         car.

10:28   12    A    Correct.

10:28   13    Q    That is an unlawful act by you.  Correct?

10:28   14                 MS. GEHLING:  Objection, argumentative.

10:28   15                 THE WITNESS:  What part -- I -- I didn't

10:28   16         tow his vehicle for the parking ticket.

10:28   17    BY MR. THOMSEN:

10:28   18    Q    I didn't ask you why it was towed ultimately.

10:28   19    A    Okay.

10:28   20    Q    I'm talking about when you're talking to Mr. Brown

10:29   21         unprofessionally -- using your words -- and you

10:29   22         told him, "Let's tow the car," you had no basis to

10:29   23         tow the car at that point in time.  Correct?

10:29   24                 MS. GEHLING:  Objection, argumentative.

10:29   25                 THE WITNESS:  That's correct.

Case 2:18-cv-00922-PP  Filed 10/08/19  Page 19 of 42  Document 60-4

| | |
|---|---|
| 10:53 | 1 |
| 10:53 | 2 |
| 10:53 | 3 |

10:53    1          THE WITNESS:  I don't know how Mr. -- or

10:53    2     Officer Grams would have treated my son.

10:53    3  BY MR. THOMSEN:

10:54    4  Q    Certainly you wouldn't have threatened your son by

10:54    5     threatening to tow his car.  Would you?

10:54    6          MS. GEHLING:  Objection, argumentative,

10:54    7     relevance, calls for speculation, foundation.

10:54    8          THE WITNESS:  I might threaten my son,

10:54    9     but -- but I don't know.

10:54   10  BY MR. THOMSEN:

10:54   11  Q    What we do know, there was no -- Strike that.  You

10:54   12     would agree with me at no point in time was there

10:54   13     reasonable suspicion that Mr. Brown had ever

10:54   14     committed a crime.  Correct?

10:54   15          MS. GEHLING:  Objection,

10:54   16     mischaracterizes testimony, argumentative.

10:54   17          THE WITNESS:  I would disagree with that.

10:55   18     At the time we felt -- or I felt that we had

10:55   19     resisting.

10:55   20  BY MR. THOMSEN:

10:55   21  Q    He'd been detained before that point in time

10:55   22     already.  Right?

10:55   23          MS. GEHLING:  Objection, foundation.

10:55   24          THE WITNESS:  Yes.  But at that time --

10:55   25     Well, yes.

10:55   1    BY MR. THOMSEN:

10:55   2    Q    Okay.  So at the point you first approach him, he'd

10:55   3         already been detained.  Right?

10:55   4    A    Yes.

10:55   5    Q    There had been no basis -- no reasonable suspicion

10:55   6         that he had committed a crime for him being

10:55   7         detained.  Correct?

10:55   8              MS. GEHLING:  Objection, foundation,

10:55   9         argumentative and calls for speculation.

10:55  10              THE WITNESS:  From -- I'm sorry.  I'm

10:55  11         about to -- At the time I didn't know what the

10:55  12         interaction between Officer Grams and him were --

10:55  13         or was, so I didn't know necessarily -- Well, I did

10:56  14         not know what had transpired.

10:56  15    BY MR. THOMSEN:

10:56  16    Q    I'm assuming your training was you're supposed to

10:56  17         find out what had transpired before you start

10:56  18         acting.  Right?

10:56  19              MS. GEHLING:  Objection, argumentative.

10:56  20              THE WITNESS:  Yes.  I failed my

10:56  21         supervisor duties at that point.

10:56  22    BY MR. THOMSEN:

10:56  23    Q    Well, you failed your -- just being an officer's

10:56  24         duties.  Right?

10:56  25              MS. GEHLING:  Objection, argumentative.

Case 2:18-cv-00922-PP  Filed 10/08/19  Page 21 of 42  Document 60-4

10:56   1   BY MR. THOMSEN:

10:56   2   Q    Every officer coming up has an obligation to ask

10:56   3        the other officer what's going on.  Correct?

10:56   4   A    I don't know if it's an obligation.

10:56   5   Q    What is it then?

10:56   6   A    Every officer -- Maybe I didn't understand your

10:56   7        question correctly.

10:56   8   Q    Well, I heard your answer.  You said as a

10:56   9        supervisor, you had an obligation to ask before you

10:57  10        started doing and acting.  Correct?

10:57  11             MS. GEHLING:  Objection.  I believe it

10:57  12        mischaracterizes his testimony, but whatever.

10:57  13             THE WITNESS:  As a supervisor, I failed

10:57  14        to do -- One of my duties was to figure out what

10:57  15        was going on beforehand.

10:57  16   BY MR. THOMSEN:

10:57  17   Q    Right.  So you failed to ask Officer Grams what the

10:57  18        situation was.  Correct?

10:57  19   A    Correct.

10:57  20   Q    You failed to ask Mr. Brown what was going on.

10:57  21        Correct?

10:57  22   A    Correct.

10:57  23   Q    You failed to ask his date what was going on.

10:57  24        Correct?

10:57  25   A    Correct.

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 22 of 42   Document 60-4

11:01  1    know if his demeanor would have changed or what, so

11:01  2    I don't know what the outcome would be.

11:01  3  BY MR. THOMSEN:

11:01  4  Q   Well, you certainly wouldn't have tried to create a

11:02  5    scenario that he was armed.  Correct?

11:02  6          MS. GEHLING:  Objection, it

11:02  7    mischaracterizes testimony and argumentative.

11:02  8          THE WITNESS:  I -- I don't -- I don't

11:02  9    know.  I guess maybe I don't understand how you're

11:02  10   asking it.

11:02  11 BY MR. THOMSEN:

11:03  12 Q   I'm showing you what was marked as 107.  Correct?

11:03  13 A   Yes, sir.

11:03  14 Q   This is a PI-21.  Right?

11:03  15 A   Correct.

11:03  16 Q   And is a PI-21 taken under oath?

11:03  17 A   I don't believe it's under oath.

11:03  18 Q   Okay.  But you are -- it's your understanding that

11:04  19   when you give a statement, correct, that it must be

11:04  20   truthful.

11:04  21 A   Yes.

11:04  22 Q   At Page 24 at Line 9 -- Well, at Lines 9 and 8, you

11:04  23   tell -- Is it Sergeant -- What is his name?

11:04  24 A   Estacio.

11:04  25 Q   -- Sergeant Estacio in quotes, "He got really

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 23 of 42   Document 60-4

11:04    1        agitated with me looking into his vehicle, and now

11:04    2        I see this gun."

11:04    3    A   May I see that?

11:04    4    Q   Sure.

11:04    5    A   Okay.  I'm sorry, what line was it?

11:04    6    Q   Lines 8 and 9, sir, of --

11:04    7    A   Of Page --

11:04    8    Q   -- Page 24.  Did I read it right?

11:05    9    A   You read it correctly.

11:05   10    Q   It wasn't true.

11:05   11    A   Oh, it was -- Yeah.  That -- I did not see a gun.

11:05   12        No.

11:05   13    Q   So if you never saw a gun, why are you telling

11:05   14        internal affairs that you saw a gun, sir?

11:05   15    A   I must have misspoke and nobody caught it.

11:05   16    Q   When you and Sergeant Mahnke were talking and when

11:05   17        Officer Collins got you on his camera unbeknownst

11:05   18        to anybody and you said, "We're protecting

11:05   19        ourselves," after Officer Collins left, what did

11:05   20        you and Sergeant Mahnke talk about?

11:05   21    A   I don't recall the specific conversation.  I do

11:06   22        know that we talked about how we were going to

11:06   23        split up the work.

11:06   24    Q   Please tell the jury how you were going to split up

11:06   25        the work.

11:06   1    A    Sergeant Mahnke was going to do the use of force,

11:06   2         and I was going to help him upload body cam.  I

11:06   3         also told him I would take the photos for the car.

11:06   4         I don't know if that was before or after our

11:06   5         conversation, though.

11:06   6    Q    And in this process of dividing up the work, how

11:06   7         was it designed to protect yourself?

11:06   8              MS. GEHLING:  Objection, vague, also

11:06   9         mischaracterizes prior testimony.

11:07  10              THE WITNESS:  Maybe I -- I didn't hear

11:07  11         you correctly before.  Were you asking about the

11:07  12         conversation before or after Officer Collins came

11:07  13         up?  Is that what you asked?

11:07  14    BY MR. THOMSEN:

11:07  15    Q    Well, I know there was a conversation going on in

11:07  16         the car.  Correct?

11:07  17    A    Correct.

11:07  18    Q    Sergeant Mahnke, you and Officer Collins for the

11:07  19         time that Officer Collins was in the car.  Correct?

11:07  20    A    By the car?  Yes.

11:07  21    Q    He actually got in the car.

11:07  22    A    Oh.  I don't remember that.

11:07  23    Q    I believe he did.  At any point in time Officer

11:07  24         Collins left.  Right?

11:07  25    A    Correct.

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 25 of 42   Document 60-4

11:31   1          explicit bias prior to your contact with Mr. Brown?

11:31   2      A   I believe so.

11:31   3      Q   And in what context would that have been?

11:31   4      A   I believe at an inservice.

11:31   5      Q   Okay.  And at the remedial training, this June

11:32   6          event that you had, was there discussion about

11:32   7          Officer Grams' use of "I own this" as reflecting

11:32   8          explicit bias?

11:32   9      A   I don't recall that term being used with the

11:32  10          discussion.

11:32  11      Q   How was the notion of bias used in that discussion?

11:32  12                  MS. GEHLING:  Objection, foundation,

11:32  13          mischaracterizes testimony.

11:32  14                  THE WITNESS:  I don't recall it being

11:32  15          used.

11:32  16      BY MR. THOMSEN:

11:32  17      Q   Okay.  Do you agree that Officer Grams' use of "I

11:32  18          own this" after pushing Mr. Brown had a racial

11:33  19          overtone?

11:33  20                  MS. GEHLING:  Objection, argumentative.

11:33  21                  THE WITNESS:  No.

11:33  22      BY MR. THOMSEN:

11:33  23      Q   Do you believe that Officer Grams' pushing

11:33  24          Mr. Brown and saying, "I own this" could be

11:33  25          perceived by an African American as having racial

11:33  1          bias?

11:33  2                  MS. GEHLING:  Objection, calls for

11:33  3          speculation, foundation.

11:33  4     BY MR. THOMSEN:

11:33  5     Q    Or reflecting racial bias?

11:33  6                  MS. GEHLING:  Same objection.

11:33  7                  THE WITNESS:  I believe it could be

11:33  8          perceived that way.

11:33  9                  (Exhibit No. 109 was marked.)

11:34  10    BY MR. THOMSEN:

11:34  11    Q    I'm going to show you what's been marked as

11:34  12         Exhibit 109.  Can you tell me what that is?

11:34  13    A    It says, "Milwaukee Police Department Investigation

11:34  14         Employee Case File History."

11:34  15    Q    And on the first page of Exhibit 109, there is a

11:34  16         reference to an incident date of 1-26-2018.  Is

11:34  17         that correct?

11:34  18    A    Correct.

11:34  19    Q    And the allegation -- Well, strike that.  That has

11:34  20         to do with your involvement with Sterling Brown.

11:34  21         Correct?

11:34  22    A    Correct.

11:34  23    Q    And the linked complainant was listed as Michael J.

11:34  24         Brunson.  Correct?

11:34  25    A    Correct.

11:34   1     Q     Who is Michael J. Brunson?

11:35   2     A     He's an assistant chief.

11:35   3     Q     And the first allegation was "Restraint,

11:35   4           6.01-Excessive Use of Force" and a finding of "not

11:35   5           sustained."  Correct?

11:35   6     A     Correct.

11:35   7     Q     Do you know who determined that that was not

11:35   8           sustained?

11:35   9                 MS. GEHLING:  Objection, foundation,

11:35   10          calls for speculation.

11:35   11                THE WITNESS:  No.

11:35   12    BY MR. THOMSEN:

11:35   13    Q     The second allegation is "Competence, 1.02-Failure

11:35   14          to Cooperate with a Citizen to Ensure Public

11:35   15          Safety."  Did I read that correctly?

11:35   16    A     Yes, sir.

11:35   17    Q     And that was to failure -- Strike that.  That

11:35   18          refers to your failure to cooperate with Mr. Brown

11:35   19          to ensure his safety.  Correct?

11:35   20                MS. GEHLING:  Objection, foundation,

11:35   21          calls for speculation.

11:35   22                THE WITNESS:  Yes.

11:35   23    BY MR. THOMSEN:

11:35   24    Q     And for that you received a policy review.

11:36   25          Correct?

Case 2:18-cv-00922-PP  Filed 10/08/19  Page 28 of 42  Document 60-4

11:36    1    A    Correct.

11:36    2                   (Exhibit No. 110 was marked.)

11:36    3    BY MR. THOMSEN:

11:36    4    Q    And I'm going to show you what's been marked as

11:36    5         Exhibit 110.  First, tell me whether you've seen

11:36    6         this document before.

11:36    7    A    No, I have not.

11:36    8                   MS. GEHLING:  It's two pages.  Look at

11:36    9         them both, please.

11:36   10                   THE WITNESS:  Oh.  Sorry.

11:36   11    BY MR. THOMSEN:

11:36   12    Q    Have you ever seen any of the documents in

11:36   13         Exhibit 110 before?

11:36   14    A    No, sir.

11:36   15    Q    Do you recall the policy review?

11:36   16    A    Yes.

11:36   17    Q    And according to this memo by Sergeant Palmer, on

11:37   18         April 16, he met with you to review a matter in

11:37   19         which you and numerous other officers failed to

11:37   20         cooperate with each other during an investigation.

11:37   21         Did I read that correctly?

11:37   22    A    Correct.

11:37   23    Q    Tell me, how long was this policy review?

11:37   24    A    This is an approximate.  15 minutes.

11:37   25    Q    And what do you recall about this 15 minutes?

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 29 of 42   Document 60-4

11:46   1          time that he may be armed.

11:46   2   BY MR. THOMSEN:

11:46   3   Q    And is that because you saw a gun in the car?

11:46   4               MS. GEHLING:  Objection, argumentative,

11:46   5          also foundation.

11:46   6               THE WITNESS:  I didn't ever see a gun in

11:46   7          the car.

11:46   8   BY MR. THOMSEN:

11:46   9   Q    All right.  There was no basis ever to believe that

11:46   10         Mr. Brown was armed.  Correct?

11:46   11              MS. GEHLING:  Objection, argumentative,

11:46   12         foundation, also mischaracterizes his previous

11:46   13         testimony.

11:46   14              THE WITNESS:  Can you just repeat the

11:46   15         first part, please?

11:47   16              (Record read.)

11:47   17              THE WITNESS:  It was my belief that he

11:47   18         was armed or possibly armed after seeing the

11:47   19         targets in his car.

11:47   20   BY MR. THOMSEN:

11:47   21   Q    You're trained on individuals' constitutional

11:47   22         rights.  Correct?

11:47   23   A    Correct.

11:47   24   Q    As a deer hunter, I have a constitutional right to

11:47   25         have a gun.  Right?

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 30 of 42   Document 60-4

11:47  1  A    Yes, sir.

11:47  2  Q    Citizens have a right to have targets in the back

11:47  3       seat of their car.  Correct?

11:47  4  A    Yes, sir.

11:47  5  Q    Citizens have the right to have targets with holes

11:47  6       in the back seat of a car.  Correct?

11:47  7  A    Yes, sir.

11:47  8  Q    And the fact that there's a target with holes in

11:47  9       the back seat of a car does not constitute a

11:48  10      reasonable suspicion that a person is armed.

11:48  11      Correct?

11:48  12            MS. GEHLING:  Objection, argumentative.

11:48  13            THE WITNESS:  Correct.

11:48  14  BY MR. THOMSEN:

11:48  15  Q    So you would agree with me there was never a

11:48  16       reasonable belief that Mr. Brown was armed.

11:48  17       Correct?

11:48  18  A    I believed at the time given his demeanor with --

11:48  19       in -- with the targets accompanying that, with my

11:48  20       belief that he didn't want us to be near his car,

11:48  21       that there was a -- that he may be armed.

11:48  22  Q    Now, Sergeant, wasn't that part of the remedial

11:48  23       training?  Didn't they tell you that that wasn't a

11:48  24       legitimate basis?

11:48  25            MS. GEHLING:  Objection, argumentative,

12:03  1      keeping his hands warm, sir?

12:03  2              MS. GEHLING:  Objection, argumentative,

12:03  3      foundation, calls for speculation.

12:03  4              THE WITNESS:  I don't know what he was

12:03  5      doing with his hands.  I --

12:03  6  BY MR. THOMSEN:

12:03  7  Q   So when he had his hands out of his pocket the

12:03  8      first time, did he have a huge bulge in his pocket

12:03  9      that looked like there was a gun there, sir?

12:03  10             MS. GEHLING:  Objection, argumentative.

12:03  11             THE WITNESS:  I don't recall seeing a

12:03  12     huge bulge.

12:03  13 BY MR. THOMSEN:

12:03  14 Q   Right.  There was nothing about Mr. Brown's pockets

12:04  15     or the way he had his hands in and out of his

12:04  16     pockets that would ever lead you to suspect that he

12:04  17     had a gun.  Correct?

12:04  18             MS. GEHLING:  Objection, mischaracterizes

12:04  19     testimony, argumentative.

12:04  20             THE WITNESS:  There was nothing specific

12:04  21     about his pockets that made me suspect he had a

12:04  22     gun.

12:04  23 BY MR. THOMSEN:

12:04  24 Q   And so then you saw his hands out of his pockets.

12:04  25     He didn't have a gun in his hands.  Right?

12:04   1   A   Correct.

12:04   2   Q   And then when he put his hand into his pockets that

12:04   3       didn't ever look like there was a gun there,

12:04   4       certainly you weren't saying, "Oh, now he has a gun

12:04   5       magically in his pocket."  Correct?

12:04   6               MS. GEHLING:  Objection, foundation,

12:04   7       argumentative.

12:04   8               THE WITNESS:  Correct.

12:04   9   BY MR. THOMSEN:

12:04  10   Q   I'm going to show you what's been marked as

12:05  11       Exhibit 112.  This is a statement that you actually

12:05  12       made sometime after the incident.  Correct?

12:05  13   A   Yes, sir.

12:05  14   Q   How many versions of this report were there?

12:05  15               MS. GEHLING:  Objection, foundation.

12:05  16               THE WITNESS:  I'm sorry.  I don't

12:05  17       understand your question.

12:05  18   BY MR. THOMSEN:

12:05  19   Q   How many drafts of this report were there?

12:05  20   A   How many -- This is, as far as I know, the only

12:05  21       report I wrote.

12:05  22   Q   Did you make any changes to the report you wrote?

12:06  23   A   No.

12:06  24   Q   On the first page of the report, middle of that

12:06  25       print, there's a paragraph that starts, "The

12:06    1             reason..."  Do you see that?

12:06    2        A    Yes.

12:06    3        Q    Well, let's start the paragraph before.  It says

12:06    4             that you "walked over to where the vehicle was

12:06    5             parked and illuminated the interior of the vehicle

12:06    6             with your flashlight."  Correct?

12:06    7        A    Yes.

12:06    8        Q    And then you said, "As soon as I did this, the

12:06    9             black male subject who was later identified as

12:06   10             Sterling Brown walked towards me."  Correct?

12:06   11        A    Correct.

12:06   12        Q    He didn't lunge towards you.  Correct?

12:06   13                  MS. GEHLING:  Objection, argumentative.

12:06   14                  THE WITNESS:  That's correct.

12:06   15        BY MR. THOMSEN:

12:06   16        Q    He didn't run towards you.

12:06   17                  MS. GEHLING:  Objection, argumentative.

12:06   18                  THE WITNESS:  Correct.

12:06   19        BY MR. THOMSEN:

12:06   20        Q    He simply walked towards you.

12:07   21        A    Correct.

12:07   22        Q    So when someone walks towards you as you're

12:07   23             approaching their car, why did you write "in what I

12:07   24             felt was an aggressive manner"?

12:07   25                  MS. GEHLING:  Objection, vague and also

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 34 of 42   Document 60-4

12:07   1          argumentative.

12:07   2                     THE WITNESS:  Because at the time when I

12:07   3          was looking into the vehicle and Mr. Brown walked

12:07   4          up, that was the sense I got, that it was

12:07   5          aggressive in how he stood so close and over me.

12:07   6     BY MR. THOMSEN:

12:07   7     Q    He didn't touch you.

12:07   8                     MS. GEHLING:  Objection, argumentative.

12:07   9     BY MR. THOMSEN:

12:07  10     Q    Right?

12:07  11     A    Correct.

12:07  12     Q    So is it the fact that he is a young African

12:08  13          American man that makes him walking "aggressive"?

12:08  14                     MS. GEHLING:  Objection, argumentative.

12:08  15                     THE WITNESS:  No.

12:08  16     BY MR. THOMSEN:

12:08  17     Q    What makes it aggressive, sir?

12:08  18     A    I don't know how to explain it any more than what I

12:08  19          stated.

12:08  20     Q    You write, "Then he immediately asked why I was

12:08  21          looking into his vehicle.  I advised Brown to not

12:08  22          walk up to an officer in the manner that he did."

12:08  23          Right?  That's what your report says?

12:08  24     A    Correct.

12:08  25     Q    There's no reference in your report that you told

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 35 of 42   Document 60-4

12:08   1          him the Supreme Court said you can look into

12:09   2          anything.  Right?

12:09   3      A   Correct.

12:09   4      Q   And the sergeant of internal affairs said if you

12:09   5          used that language with him, he would be mad as

12:09   6          hell or something to that effect?

12:09   7                  MS. GEHLING:  Objection, foundation.

12:09   8                  THE WITNESS:  I believe that's correct.

12:09   9      BY MR. THOMSEN:

12:09  10      Q   You then say, "I then told Brown to get away from

12:09  11          the vehicle."  Yeah?

12:09  12      A   Yes, sir.

12:09  13      Q   And then you say, "The reason I did this is because

12:09  14          I did not know what was in the vehicle, and based

12:09  15          on what Sergeant Mahnke told me, I felt there was a

12:09  16          possibility that Brown was either going to attempt

12:09  17          to get into the vehicle and flee or there was

12:09  18          something illegal in the vehicle."  Did I read that

12:10  19          correctly?

12:10  20      A   Correct.

12:10  21      Q   What did Sergeant Mahnke tell you?

12:10  22      A   I don't recall the exact conversation.

12:10  23      Q   Just tell me general conversation.  What did

12:10  24          Sergeant Mahnke generally tell you so now you had a

12:10  25          possibility that Mr. Brown was going to attempt to

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 36 of 42   Document 60-4

```
12:23   1          submitted to the Honorable, the Board of Fire and
12:23   2          Police Commissioners of the City of Milwaukee by
12:23   3          Chief Alfonso Morales on May 21, 2018, regarding
12:23   4          charges against you.  Correct?
12:23   5     A    Correct.
12:23   6     Q    And you have seen this document before, presumably.
12:23   7     A    I may have.  It doesn't look familiar to me.  I'm
12:23   8          sorry.
12:23   9     Q    Look at Page 3 and at the bottom paragraph, the
12:23  10          second to last sentence.  It says, in quotes, "His
12:24  11          failure in not allowing the initiating officer to
12:24  12          conduct his investigation and resolve with a
12:24  13          citation as prescribed by the violation in question
12:24  14          led to the escalation of force and concluded with
12:24  15          eight officers using force and a citizen being
12:24  16          tased."  Did I read that correctly?
12:24  17     A    Correct.
12:24  18     Q    And the "his failure" there, that's a reference to
12:24  19          Sergeant Krueger -- you.  Correct?
12:24  20     A    Yes.
12:24  21     Q    Do you agree with that?
12:24  22                  MS. GEHLING:  Objection, argumentative.
12:24  23                  THE WITNESS:  Yes.
12:24  24                  (Exhibit No. 115 was marked.)
12:24  25     BY MR. THOMSEN:
```

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 37 of 42   Document 60-4

12:25  1    Q    And I'm going to show you what's been marked as

12:25  2         Exhibit 115.  Have you ever seen this document

12:25  3         before?

12:25  4    A    No, I have not.

12:25  5    Q    Do you understand what it is?  Put it this way.  Do

12:25  6         you know what a discipline review summary is?

12:25  7    A    I don't believe I've ever seen one before, so if I

12:25  8         can just have a moment to look at this.

12:25  9    Q    Oh, of course.  Of course.  Of course.

12:26  10   A    I'm done, sir.

12:26  11   Q    Okay.  Do you know what a discipline review summary

12:26  12        is?

12:26  13   A    It's apparently the review of the internal

12:26  14        investigation.

12:26  15   Q    And you admitted to the charges.  Correct?

12:26  16   A    Yes.

12:26  17   Q    There is a reference here, in quotes, "Member

12:26  18        responded to charges and took responsibility for

12:26  19        his actions."  Do you see that?

12:27  20   A    Yes, sir.

12:27  21   Q    And when you took responsibility for your actions,

12:27  22        you were admitting that your failure to act in a

12:27  23        proper supervisory manner resulted in Mr. Brown

12:27  24        being taken down and tased.  Correct?

12:27  25             MS. GEHLING:  Objection, argumentative.

Case 2:18-cv-00922-PP   Filed 10/08/19   Page 38 of 42   Document 60-4

12:27   1                    THE WITNESS:  I believe that my failure

12:27   2          to supervise did not -- I wouldn't say my failure

12:27   3          was the exact and direct reason it happened.  It

12:27   4          was definitely a part of the reason that the

12:27   5          outcome was the way it was.

12:27   6    BY MR. THOMSEN:

12:27   7    Q    I guess that's fair, because there were two

12:27   8          sergeants involved.  Correct?

12:27   9    A    Yes, sir.

12:27  10    Q    Okay.

12:28  11                    MR. THOMSEN:  Let's go off the record for

12:28  12          a moment.

12:28  13                    THE VIDEOGRAPHER:  We are off the record

12:28  14          at 12:28 p.m.

12:28  15                    (A break was taken.)

12:43  16                    THE VIDEOGRAPHER:  We are back on the

12:43  17          record at 12:43 p.m.

12:44  18                    (Exhibit No. 116 was marked.)

12:44  19    BY MR. THOMSEN:

12:44  20    Q    Sergeant Krueger, I'm going to show you what's been

12:44  21          marked as Exhibit 116, and this is a memo from

12:44  22          Sergeant Hines to Captain Kavanagh dated

12:44  23          November 27, 2018?

12:44  24    A    Yes, sir.

12:44  25    Q    And this is a discussion of a session Sergeant

Case 2:18-cv-00922-PP  Filed 10/08/19  Page 39 of 42  Document 60-4

12:48  1          MS. GEHLING:  Same objection.

12:48  2          THE WITNESS:  I don't know why I didn't

12:48  3      write it in my report.

12:48  4  BY MR. THOMSEN:

12:48  5  Q   I mean, this is Officer Grams telling his

12:48  6      supervisor -- you -- right after Mr. Brown is tased

12:48  7      "Hey, if he just wouldn't have been a dick, I would

12:48  8      have just said, 'Hey, here you go.'"  Right?

12:48  9  A   That's what he said.  Yes.

12:49  10  Q   I mean, he didn't say anything about a robbery.

12:49  11      Right?

12:49  12          MS. GEHLING:  Objection, foundation.

12:49  13          THE WITNESS:  Correct.

12:49  14  BY MR. THOMSEN:

12:49  15  Q   He didn't say anything about dead bodies or

12:49  16      possible dead bodies in the Walgreens.  Right?

12:49  17          MS. GEHLING:  Objection, foundation.

12:49  18          THE WITNESS:  Correct.

12:49  19  BY MR. THOMSEN:

12:49  20  Q   Now, were you also in the vehicle when Officer

12:49  21      Collins was calling Mr. Brown a douchebag?

12:49  22  A   I'm -- Yes, I was in a squad car when that

12:49  23      happened.

12:49  24  Q   And the session you had with Sergeant Hines in

12:49  25      November of 2018 again referred to that when

Case 2:18-cv-00922-PP  Filed 10/08/19  Page 40 of 42  Document 60-4

12:51   1              MS. GEHLING:  Objection, foundation, also

12:51   2         argumentative.

12:51   3              THE WITNESS:  I don't recall.

12:51   4    BY MR. THOMSEN:

12:51   5    Q    You agree that Officer Collins had no basis to be

12:51   6         standing on Mr. Brown's leg.  Correct?

12:51   7              MS. GEHLING:  Objection, argumentative,

12:51   8         foundation, calls for speculation.

12:51   9              THE WITNESS:  I don't know the context of

12:51  10         when he was standing on his foot.  It's not a

12:52  11         trained technique.

12:52  12    BY MR. THOMSEN:

12:52  13    Q    It's clearly an unreasonable use of force.

12:52  14         Correct?

12:52  15              MS. GEHLING:  Objection, argumentative,

12:52  16         foundation.

12:52  17              THE WITNESS:  I don't know how much force

12:52  18         was applied.  I would call it "untrained and

12:52  19         probably inappropriate," but "unreasonable"?  I

12:52  20         don't know.

12:52  21    BY MR. THOMSEN:

12:52  22    Q    Are you aware of any Milwaukee Police Department

12:52  23         officers that have been disciplined based on their

12:52  24         race?

12:52  25              MS. GEHLING:  Objection, vague.

12:52    1                        THE WITNESS:  I'm sorry, could you repeat

12:52    2           that?

12:52    3    BY MR. THOMSEN:

12:52    4    Q    Are you aware of any -- Strike that.  Let me

12:52    5           reframe that question.  You have been on the force

12:52    6           for how many years, did you say?

12:53    7    A    13.

12:53    8    Q    And in those 13 years, are you aware of any

12:53    9           Milwaukee Police Department officers that have been

12:53    10          disciplined for excessive use of force?

12:53    11                       MS. GEHLING:  Objection, foundation.

12:53    12                       THE WITNESS:  I don't recall.  Excessive

12:53    13          use of force?  No, I don't.

12:53    14    BY MR. THOMSEN:

12:53    15   Q    And in those same 13 years, are you aware of any

12:53    16          officers that have ever been disciplined for racist

12:53    17          conduct?

12:53    18                       MS. GEHLING:  Objection, vague, also

12:53    19          foundation.

12:53    20                       THE WITNESS:  No.  Not that I recall.

12:54    21                       MR. THOMSEN:  Thank you, Sergeant

12:54    22          Krueger.

12:54    23                       THE WITNESS:  All right.

12:54    24                       MR. THOMSEN:  That's all I have for

12:54    25          today.