

# City of Milwaukee

## General Certification

I, James R. Owczarski, certify the attached:

1.  Signed Settlement Agreement, Sterling Brown v. City of Milwaukee, et al, Civil Action No. 218-cv-922 (3 copies)

2.  Exhibit A - Joint Statement Between City of Milwaukee and Sterling Brown

3.  Exhibit B - Milwaukee Police Department SoP Proposals

are true and correct copies filled with the office of the City Clerk on May 18, 2021.

**CITY CLERK**   _James R. Owczarski_

5/20/2021
*Date:*

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

Sterling D. Brown,
        Plaintiff,

v.                              Civil Action No. 2:18-cv-922

City of Milwaukee, et al.
        Defendants.

## SETTLEMENT AGREEMENT

The City of Milwaukee by the Mayor and Common Council, the individual capacity defendants, and Sterling D. Brown, having considered all issues and having engaged in good faith negotiations, hereby agree as follows:

1. Defendant City of Milwaukee, on its own behalf, will issue a joint statement (Exhibit A) between itself and Mr. Brown in conjunction with this Settlement Agreement expressing their shared perspectives on issues related to this matter and the obligations that will be met to resolve this litigation.

2. Among those obligations, defendant City of Milwaukee shall prepare the proposed revised policies detailed in Exhibit B – which, among other things, implement Milwaukee Police Department's ("MPD") embrace of a policy of anti-racism – for final action by the Fire and Police Commission ("FPC"). Additionally, the City and MPD are preparing and shall propose to FPC a discipline matrix that will ensure meaningful, certain, and reasonable consequences for violations of these new, as well as existing, MPD Standard Operating Procedures. These revised polices, including the discipline matrix, will be implemented through procedures that conform with the requirements of Wisconsin State law.

3. The proposed revised policies detailed in Exhibit B will be submitted to the FPC for final approval within sixty days of final execution of this Agreement. Defendant City of Milwaukee, with the City Attorney as appropriate, shall recommend that the FPC enact the proposed revised policies described herein. If the FPC does not enact any of the proposed revised policies prepared pursuant to this paragraph, the Parties and the Executive Director of the FPC shall meet and confer with each other to prepare another revision to the proposed revised policies for submission to the FPC for enactment.

4. The obligations undertaken herein shall sunset three years after final execution of this agreement.

5. The City of Milwaukee will promptly pay $750,000.00 for compensatory damages, attorney's fees, and costs with the settlement check made payable to the Gingras, Thomsen & Wachs, LLP Client Trust Account.

6. Upon execution and the filing of this Settlement Agreement, the Parties consent to a dismissal of this matter, with prejudice and without further costs, and the Parties also consent to this Court's subsequent jurisdiction to enforce the terms of this Settlement Agreement.

7. Nothing in this settlement agreement shall be construed as an admission of liability by, or in a manner that would affect the employment with MPD of, the individual capacity defendants.

8. This release fully extinguishes all claims and causes of action, including but not limited to those for: compensatory damages; loss of society, companionship and consortium; punitive damages; hedonic damages; costs and fees, including attorneys' fees; statutory damage awards; and liability based upon indemnification claims. In making this release, all rights to bring any other claims against anyone are fully extinguished since full compensation for all injuries and damages will be paid.

9. This Settlement Agreement and Release shall in all respects be interpreted, enforced, and governed under the laws of the State of Wisconsin.

10. Should any specific provision or provisions of this Settlement Agreement and Release be declared or be determined by any court to be illegal, invalid, and/or against public policy, the validity of all remaining parts, terms, or provisions shall not be affected thereby, and said illegal and invalid provision or term shall be deemed not to be part of the Agreement.

11. This entire agreement is subject to approval by the Milwaukee Common Council and the Mayor.

_____  
Date

May 5, 2021

_____  
City Attorney Tearman Spencer  
Counsel for All Defendants

_____  
Date

March 25, 2021

_____  
Attorney Mark L. Thomsen  
Gingras, Thomsen, and Wachs, LLP  
Counsel for Plaintiff Sterling D. Brown

3

## JOINT STATEMENT BETWEEN CITY OF MILWAUKEE AND STERLING BROWN

### (EXHIBIT A)

### [DATE]

The City of Milwaukee and MPD apologize for the encounter and actions between Mr. Brown and MPD officers on January 26, 2018. The City further recognizes that the incident escalated in an unnecessary manner and despite Mr. Brown's calm behavior.

The City of Milwaukee redoubles its commitment to the highest standards of professionalism in our police department and to the highest level of respect for the civil rights of our citizens. Toward that end, the following steps have been or will be taken:

1) The officer who initiated the incident with Mr. Brown has been reassigned from patrol responsibilities;

2) The City will move to strike, prior to dismissal of the suit, Affirmative Defenses 5 and 12 asserted in the City's Answer, which claimed that Mr. Brown's injuries were due to his own acts or omissions, as discovery to date has not supported these defenses;

3) MPD has used the body camera footage of the incident involving Mr. Brown to train its officers on how to avoid unnecessary escalation through better communication with the public;

4) MPD will work jointly with Mr. Brown on a number of education and outreach projects, such as the Police Athletic League and new recruit training, to facilitate better communication and understanding between MPD and the community it serves; and

5) Defendant City of Milwaukee shall prepare the proposed revised policies detailed in Exhibit B, which, among other things, implement MPD's embrace of a policy of anti-racism, through procedures that conform with the requirements of Wisconsin State law, and shall ensure that these proposed revised policies are ready for submission to the Fire and Police Commission ("FPC") for final approval within thirty days of entry into this Agreement. Defendant City of Milwaukee, with the City Attorney as appropriate, shall recommend that the FPC enact the proposed revised policies described herein.

6) The City and MPD are committed to implementing a discipline matrix that will ensure meaningful, certain, and reasonable consequences for violations of MPD Standard Operating Procedures.

[NOTE:  CONSEQUENCES FOR VIOLATIONS OF THESE AND OTHER SoPs ARE
ADDRESSED IN A SEPARATE DISCIPLINE MATRIX TO BE APPROVED BY FPC
ACCORDING TO ALL LEGAL AND PROCEDURAL REQUIREMENTS]

(EXHIBIT B)

[DATE}

HIGHLY CONFIDENTIAL

## 001 FAIR AND IMPARTIAL POLICING

01.0    PURPOSE

The work of our police members has a substantial and positive effect on crime and helps us pursue our mission of creating neighborhoods capable of sustaining civic life. MPD recognizes that unlawful violence and racism, especially if perpetrated by police officers, as well as crime, disproportionately impact communities of color, and that police tactics can at times be perceived as frightening or alienating. Consequently, an unfortunate paradox exists: the vulnerable neighborhoods most in need of services and assistance are inhabited by residents who sometimes unfairly targeted by police. We must be aware that the way our authority is used is equally as important as the result of its use.

To that end, this policy is intended to establish this department's commitment to combat racist and discriminatory practices and to clarify the circumstances in which officers can consider race, color, ethnicity, national origin, economic status, sexual orientation, gender identity or expression, age, gender, religion, limited English proficiency, disability, and housing status when making law enforcement decisions, and to reinforce procedures that serve to ensure the public that we are providing service and enforcing laws in an equitable way.

01.05 POLICY

Police members shall be anti-racist and anti-discriminatory and shall not rely to any degree on an individual's race, color, ethnicity, national origin, economic status, sexual orientation, gender identity or expression, age, gender, religion, limited English proficiency, disability, or housing status in carrying out law enforcement activities except when credible, locally relevant information links a person or people of specific characteristics/status, as listed above, to a specific unlawful incident, or to specific unlawful incidents, criminal patterns, or schemes. This restriction on the use of race/ethnicity does not apply to law enforcement activities solely designed to strengthen the department's relationship with a diverse community.

**Note:  Biased based profiling by our police members is prohibited and is defined as the following: Police-initiated action that relies to any degree upon common traits associated with belonging to a certain group; such as race, color, ethnicity, national origin, ancestry, age, gender, gender identity or expression, sexual orientation, religion, marital status, economic status, disability, political affiliation, cultural group, limited English proficiency, disability, housing status or any other identifiable characteristics of an individual rather than  the  behavior  of  that individual,  or  credible  information  that  leads  the police to a particular individual who has been identified as being engaged in or having been engaged in criminal activity.**
(WILEAG 1.7.8.1)

HIGHLY
                                                                        CONFIDENTIAL

## 082 – TRAINING AND CAREER DEVELOPMENT

082.00 PURPOSE The purpose of this standard operating procedure is to establish guidelines for employee training and development under the direction of the training director at the Training Division, the Human Resources Division, and the Chief of Police. The Milwaukee Police Department (MPD) provides basic recruit training and continuing education that exceeds requirements established by the state of Wisconsin Law Enforcement Standards Board (LESB) and the Training and Standards Bureau. In addition, the purpose of this standard operating procedure is to ensure that the members of the Milwaukee Police Department are verifiably competent with all department policies and with the principles of fair and impartial policing. Members subordinate to the rank of inspector of police shall follow the directives of the training director in matters relating to law enforcement certification and recertification training, and other training that may arise relevant to members' positions or work assignments.

082.01 ANTI-RACIST and ANTI-DISCRIMINATORY POLICY TRAINING

The Milwaukee Police Department is committed to the implementation of anti-racist and anti-discriminatory policies throughout the force, and throughout the City of Milwaukee. To that end, every member of the MPD must annually complete at least four (4) hours of bias training, which includes training on anti-racist and anti-discriminatory policies. This training includes a special focus for supervisors on detecting and reporting improper conduct. To demonstrate subject-matter competency, all members must successfully complete a written examination, including as to their understanding of MPD's anti-racist and anti-discriminatory policies. Members who fail the examination must receive immediate remedial training until a member can demonstrate core competency. MPD members must pass this written examination each year.

HIGHLY
CONFIDENTIAL

082.03 CORRUPTION IN TRAINING PROHIBITED

Any MPD member performing any training of any other MPD member is prohibited from describing or counseling on how to avoid culpability for violating MPD policy or the law.

Each MPD member carries an affirmative duty to report any such commentary. Any member's failure to report such commentary by any MPD member may result in formal discipline.

Any MPD member who, while training any other MPD member, describes or counsels those other MPD members on how to lie or avoid culpability for violations of MPD policy or the law may be terminated.

082.04 DE-ESCALATION TRAINING

Every member of the MPD must annually complete at least four (4) hours of scenario-based training on lawful use-of-force options, focusing on skills and tactics that minimize the likelihood of using unlawful excessive force, including de-escalation tactics. Such tactics are actions and techniques used by law enforcement to slow down or stabilize a potentially unstable situation to allow for more time, options, and resources for resolution or prevention of an incident. Use of force is not a proper application of de-escalation tactics.

082.05 RECRUIT OFFICER BASIC TRAINING (WILEAG 12.2.3)

Sworn officers must satisfactorily complete the Wisconsin law enforcement basic training curriculum established by the LESB and the Training and Standards Bureau prior to assignment to any duties that require them to unilaterally exercise police authority, carry a department-issued firearm outside of training, and make arrests.

In addition, under this section officers must first pass a written examination covering Milwaukee Bias Policing and Patterns and Trends, including core competency of MPD's SOP 001, anti-discriminatory policies, cultural competency, de-escalation and professional communication.

HIGHLY
CONFIDENTIAL

220.05 POLICY

It is the policy of the Milwaukee Police Department that all arrests made by members both on or off duty shall be conducted professionally and in accordance with established legal principles and MPD policies.

5

HIGHLY
CONFIDENTIAL

085.00 PURPOSE / POLICY

The purpose of this policy is to provide general guidance for enforcement actions, particularly citizen contacts (for traffic stops, field interviews, and no-action encounters), arrests, searches and seizures of persons or property, which shall be based on the standards of reasonable suspicion or probable cause as required by the Fourth Amendment to the U.S. Constitution, statutory authority, applicable case law, <u>or MPD policies and procedures.</u>

In all enforcement decisions, officers shall be able to articulate specific facts, circumstances, and conclusions which support objective, individualized reasonable suspicion for stops and frisks of individuals, and/or objective individualized probable cause for arrests, searches, and seizures of individuals.

Consistent with state and federal law, as well as <u>MPD policies and procedures</u>, including the guiding principles of the Code of Conduct of the Milwaukee Police Department, police members shall not stop, frisk, detain, arrest, search, or attempt to search anyone based solely upon the person's race, color, sex, sexual orientation, gender expression, national origin, disability, ethnicity, age, religion or social economic status.

6

HIGHLY
CONFIDENTIAL

## 450 – PERSONNEL INVESTIGATIONS

450.35 INVESTIGATION PROCEDURES (WILEAG 1.9.3, 1.9.4)

…

F. PI-21 INTERVIEW PROCEDURES (OBTAINING ORAL STATEMENTS)

…

8.  If, at any time, the MPD determines that a member lied or knowingly submitted false information during a PI-21 interview, that member may be terminated.

…

I.  COMMANDING OFFICER'S SUMMARY REPORT

1.  Sustained

There is sufficient evidence to prove either the allegation(s) made in the complaint, or the allegation(s) identified through subsequent investigation. If sustained, the Code of Conduct violation shall be cited.

Commanding Officer's Summary Reports that sustain a complaint may be obtained through procedures established under Wisconsin Statutes related to public records.

…

450.50 INTERNAL AFFAIRS DIVISION - RISK MANAGEMENT RESPONSIBILITIES / AUTHORITY (WILEAG 1.9.1, 1.9.2, 1.9.3, 1.9.6)

A.  The commanding officer of the Internal Affairs Division - Risk Management shall make diligent inquiry into every complaint of misconduct on the part of a department member coming to his/her attention.

As part of such diligent inquiry, a specific finding must be made by the commanding officer of the Internal Affairs Division – Risk Management, as to whether any violations occurred under any and all MPD Policies governing use of force and Fair and Impartial Policing.

Upon completion of such diligent inquiry, the commanding officer of the Internal Affairs Division – Risk Management shall produce any related public records as

required by and through procedures established under Wisconsin Statutes related to public records.

B. Personnel assigned to the Internal Affairs Division - Risk Management (Internal Investigations Section, Special Investigations Section, and Civil Investigations Section) are the designees of the Chief of Police as it relates to their investigations. As such, while performing these duties, personnel so assigned shall exercise the authority of the Chief's office under the direction of the commanding officer of the Internal Affairs Division - Risk Management.

C. Orders issued by supervisors assigned to the Internal Affairs Division – Risk Management (Internal Investigations Section or Special Investigations Section) pertaining to a personnel investigation shall be obeyed, regardless of the rank of the department member receiving the order.

D. The Internal Affairs Division - Risk Management shall be responsible for notifying both the affected department member(s) and citizen complainant(s) regarding the results of personnel investigations. Notification letters and memos shall be made a part of the investigative file.

E. The commanding officer of the Internal Affairs Division - Risk Management shall conduct a review of all personnel investigations after the completion of the investigation. (WILEAG 1.9.1.3)

HIGHLY
CONFIDENTIAL

**460.00 PURPOSE**

The purpose of this procedure is to provide instructions for the proper use of force by police members, provide a fair and impartial review of use of force incidents, determine whether the actions of police members were justified, and to maintain public confidence in the Milwaukee Police Department.

**460.05 POLICY**

It is the policy of the Milwaukee Police Department that members hold the highest regard for the sanctity of human life, dignity, and liberty of all persons. It is the policy of the department to accomplish the department's mission with the cooperation of the public and with minimal reliance upon the use of physical force consistent with the MPD's purpose of serving and protecting all people, including those suspected of crimes. The Milwaukee Police Department is committed to resolving conflict through the use of professional communication skills, crisis intervention, and de-escalation tactics, when feasible. Members shall only use the force necessary to perform their duties and in accordance with department policy. Unlawful or excessive force is expressly prohibited.

**460.10 DISTURBANCE RESOLUTION MODEL (WILEAG 5.1.2, 5.1.4)**

It is the policy of the Milwaukee Police Department that all uses of force will comply with the state of Wisconsin Defense and Arrest Tactics (DAAT) Disturbance Resolution Model, Intervention Options, as outlined below:

**A. APPROACH CONSIDERATIONS**

| Decision Making | Justification |
| --- | --- |
| | Desirability |
| Tactical Deployment | Control of Distance |
| | Positioning (relative positioning/relative positioning with multiple subjects |
| | Team Tactics |
| Tactical Evaluation | Threat Assessment Opportunities |
| | Officer/Subject Factors |
| | Special circumstances |
| | Level/stage/degree of stabilization |

**B. INTERVENTION OPTIONS**

HIGHLY
CONFIDENTIAL

| Mode | Purpose |
|---|---|
| Presence | To present a visible display of authority |
| Dialogue | To verbally persuade |
| Control Alternatives | To overcome passive resistance, active resistance, or their threat |
| Protective Alternatives | To overcome continued resistance, assaultive behavior, or their threats |
| Deadly Force | To stop the threat |

1. Department authorized and issued less lethal weapons include an approved wooden baton, approved expandable baton, TASERTM X2 ECD, and MK-3 (small canister) and MK-4 (large canister) Oleoresin Capsicum.

a. Members shall refer to SOP 465 Hand Held Chemical Agent and SOP 467 Electronic Control Device regarding the use of Oleoresin Capsicum and electronic control devices, which are control alternatives.

b. The approved wooden baton and approved expandable baton are intermediate weapons under protective alternatives. The goal of using a baton is to impede a subject, preventing him or her from continuing resistive, assaultive, or otherwise dangerous behavior.

2. Department authorized and issued less lethal weapons issued to the Tactical Enforcement Unit include:

a. REDACTED

b. REDACTED

c. Members shall refer to the Tactical Enforcement Unit SOI regarding the use of less lethal weapons issued to the Tactical Enforcement Unit.

## C. FOLLOW-THROUGH CONSIDERATIONS

| Stabilize | Application of restraints, if necessary |
|---|---|
| Monitor/Debrief | Maintain alertness (subject's condition, etc)/Communication (normalize scene) |
| Search | If appropriate |
| Escort | If necessary |
| Transport | If necessary |
| Turn over/Release | Removal of restraints, if neccesary |

**Note: Police members shall be trained and qualified in the safe and proficient use of department authorized and issued firearms. Police**

HIGHLY
CONFIDENTIAL

**members shall be required to qualify with a state certified department firearms instructor prior to being authorized to carry such firearms and shall be required to maintain their qualification in order to ensure continual safe and proficient firearm use. All sworn members shall receive a copy and demonstrate their understanding of this directive before being authorized to carry any firearm.** (WILEAG 5.1.2.2)

## 460.15 OBJECTIVE REASONABLENESS (WILEAG 5.1.1)

The use of force by a police member must be objectively reasonable. Police members shall use only the force necessary to effectively maintain control of a situation and protect the safety of police members and the public. Objective reasonableness is judged from the perspective of a reasonable police member facing similar circumstances and is based on the totality of the facts known to the police member at the time the force was applied, along with the member's prior training and experience, without regard to the underlying intent or motivation of the police member.

## 460.20 DE-ESCALATION

A. De-escalation tactics and techniques are actions used by members, when safe and without compromising law enforcement priorities, that seek to minimize the likelihood of the need to use force during an incident and increase the likelihood of voluntary compliance.

B. Whenever reasonable according to department policies and training, members shall use de-escalation tactics to gain voluntary compliance and seek to avoid or minimize use of physical force.

C. When safe and feasible under the totality of circumstances members shall:

1. Attempt to slow down or stabilize the situation so that more time, options, and resources are available for incident resolution. Mitigate the immediacy of threat to give more time to call additional officers or specialty units and to use other resources.

2. Consider whether a subject's lack of compliance is a deliberate attempt to resist or an inability to comply based on factors including, but not limited to:

   a. Medical conditions;

   b. Mental impairment;

   c. Developmental disability;

HIGHLY
CONFIDENTIAL

d. Physical limitation;

e. Language barrier;

f. Drug interaction;

g. Behavioral crisis.

**Note: A member's awareness of these possibilities, when time and circumstances reasonably permit, shall then be balanced against the facts of the incident facing the member when deciding which tactical options are the most appropriate to bring the situation to a safe resolution.**

D. De-escalation tactics include, but are not limited to:

1. Placing barriers between an uncooperative subject and a member.

2. Attempting to isolate and contain the subject.

3. Moving from a position that exposes members to potential threats to a safer position.

4. Reducing exposure to a potential threat using distance, cover or concealment.

5. Communication from a safe position intended to gain the subject's compliance, using verbal persuasion, advisements or warnings.

6. Avoidance of physical confrontation, unless immediately necessary (e.g., to protect someone or stop dangerous behavior).

7. Using verbal techniques to calm an agitated subject and promote rational decision making.

8. Calling additional resources to assist including additional officers or the Crisis Assessment Response Team (CART).

9. Other non-physical tactics that attempt to achieve police objectives by gaining compliance by non-physical means.

## 460.25 AMOUNT OF FORCE (WILEAG 5.1.2, 5.1.3)

A. Force that is intended or likely to cause great bodily harm or death may only be used as a last resort:

1. If reasonable under all the circumstances then existing to prevent great bodily harm or death to the officer or a third party;

HIGHLY
CONFIDENTIAL

2. When necessary to prevent a suspect's escape and the officer has probable cause to believe that the suspect presently poses a significant threat of great bodily harm or death to the officer or others; (WILEAG 5.1.2.1)

3. To kill an animal if the officer or another person is threatened with serious bodily harm by the animal or otherwise to provide for the safety of the general public; or

4. To kill an animal that has been so badly injured that its destruction would prevent further suffering.

B. Police members may draw or display their firearms in circumstances where they reasonably believe it may be necessary for the safety of others or for his or her own personal safety. Members shall not point a firearm at or in the direction of a person unless there is a reasonable perception of a substantial risk that the situation may escalate to justify deadly force.

C. The firing of warning shots is prohibited. When feasible, members should identify themselves as an MPD officer and give a verbal warning should be given prior to the use of force likely to cause great bodily harm or death.

D. Police members shall not discharge their firearm at a person who presents a danger only to him or herself (e.g., attempted suicide).

E. Police members shall not engage in chokeholds, strangleholds, lateral vascular neck restraints, carotid restraints, or any other tactic that restricts oxygen or blood flow to the head or neck unless the member is involved in a deadly force situation and has reasonably exhausted all other options and tactics. Deadly force shall only be used when the officer reasonably believes it is necessary to prevent death or great bodily harm to himself/herself or to others.

F. Members shall not utilize Oleoresin Capsicum (OC) on peaceful demonstrations. A peaceful demonstration is defined as a gathering of people expressing a position in a cooperative manner without violation of the law.

## 460.30 DUTY TO INTERVENE

Any officer who personally observes another officer using force, which the observing officer, based on their training, believes or knows to be beyond that which is objectively reasonable under the circumstances, shall reasonably attempt to intervene to prevent the use of such excessive force, if the observing officer is in a position to do so, and if any such intervention does not jeopardize safety. Any such intervening officer shall promptly report their observations, along with his/her own intervening actions to a supervisor. A failure to intervene in any unreasonable use

HIGHLY CONFIDENTIAL

of force, when there is an opportunity to do so, demonstrates a lack of courage, and a violation of the Code of Conduct <u>and of this SOP</u>.

Any supervisor to whom such intervention or failure to intervene is reported must comply with the reporting and investigation requirements of SoP 450.5.

## 460.45 RENDERING FIRST AID FOLLOWING USE OF FORCE

A. If a subject states he or she cannot breathe, states he or she is having chest pains, requests medical attention or if the officer observes the subject in medical distress when utilizing force, the officer shall immediately evaluate the situation and determine if an alternative restraint or technique can be safely and effectively utilized that will allow the person to breathe properly without compromising officer safety. The member shall then request medical aid as soon as reasonably possible.

B. Once the person has been controlled and placed in restraints on the ground, the police member shall roll the person onto their side or into a sitting position as soon as possible. This procedure is performed to prevent injury to the person and to facilitate the member's monitoring of the person's physical condition.

C. Following the use of lethal or less lethal weapons, or other applications of force, members shall render or request medical aid, if needed or if requested by anyone, as soon as reasonably possible. This may include detecting obvious change in condition or behavior, clearing chemical agents from the eyes, providing first aid, evaluation by emergency medical services or immediate aid by medical professionals. Members shall request medical aid if a person is exposed to Orthochlorobenzalmalononitrile (CS) or Oleoresin Capsicum (OC) as soon as reasonably possible.

## 460.50 USE OF FORCE REPORT (PF) (WILEAG 5.2.1, 5.3.1, 5.3.2)

A. PURPOSE

The Use of Force Report is designed to document those incidents involving the use of force by department members as described herein. The report shall be completed by a supervisory officer of a higher rank than the member that used force, except for supervisors assigned to the Internal Affairs Division - Risk Management who can investigate and complete a Use of Force Report for any department member.

B. WHEN TO FILE REPORT

1. The Use of Force Report shall be completed by a supervisory officer when a department member:

    a. Discharges a firearm except in a training situation or for lawful recreational purposes.

    b. Points a firearm at a person.

    c. Uses a baton to strike a subject or animal in the line of duty.

    d. Discharges an irritant, chemical, or inflammatory agent.

    e. Deploys an electronic control device to include contact stun and probe deployment.

    f. Department canine bites a person.

**Note: This section does not apply when a department canine bites a person during a training session. If the department canine bites a person during a training session, the bite shall be documented on a Department Memorandum (form PM-9E) and forwarded through the chain of command to the commanding officer of the Specialized Patrol Division.**

    g. Forcible blood draws requiring use of force to obtain a sample where a subject claims injury or is injured as a result of police action.

    h. Uses bodily force that involves focused strikes, diffused strikes, or decentralizations to the ground.

    i. Uses any type of force in which a person is injured or claims injury, whether or not the injury is immediately visible. (WILEAG 5.3.1.1, 5.3.1.2, 5.3.1.3, 5.3.1.4)

    j. Draws or displays a firearm (including a shotgun or rifle) to effect an arrest or seizure of a person.

**Note: When in doubt as to whether a use of force incident should be documented on a Use of Force Report, notify your shift commander or immediate supervisor for guidance and direction.**

2. The supervisor responsible for filing a Use of Force Report shall obtain a number in the AIM system prior to securing from duty on the date in which the incident occurred. The member(s) and subject(s) names, date, time and location of the incident shall also be entered on the same date the number was generated.

        HIGHLY CONFIDENTIAL

3. In any situation which triggers the filing of a Use of Force Report photographs must be taken of the subject against whom force was used, to illustrate any injury or lack thereof.

4. The Use of Force Report is to be completed and tracked to the appropriate supervisor/shift commander within 3 days of the incident. A critical incident Use of Force Report shall be filed in accordance with section 460.45.

5. Each subsequent review by the shift commander/commanding officer shall be completed and tracked in an expeditious manner.

6. Reports shall be thoroughly completed and reviewed within thirty (30) days following the date on which the incident occurred and then tracked to the Internal Affairs Division - Risk Management.

7. The Internal Affairs Division - Risk Management shall review reports within fourteen (14) days following receipt from the commanding officer of that work location.

C. NOTIFICATION

1. Members using force as described in 460.45(B) shall, as soon as possible, notify their immediate supervisor. The supervisor shall determine if the use of force resulted in injury, great bodily harm, or death to a person.

2. Department members having knowledge of uses of force as described in 460.45(B) shall as soon as possible also notify their immediate supervisor.

3. If the use of force resulted in great bodily harm or death to a person, or if injury was sustained as a result of the member's use of a firearm, the supervisor shall notify his/her shift commander. The shift commander shall then notify the Criminal Investigation Bureau shift commander.

4. Whenever a police member intentionally discharges a firearm at a person (regardless of whether personal injury or property damage occurs), the member shall promptly notify his/her shift commander of such fact. That shift commander shall promptly notify the Criminal Investigation Bureau shift commander.

5. All Other Types of Force

If the use of force did not involve great bodily harm or death to a person, but involved a use of force as otherwise listed above, the responding supervisor shall notify his/her shift commander. The shift commander may consult with the Criminal Investigation Bureau shift commander to determine if the field

HIGHLY
CONFIDENTIAL

supervisor or a police lieutenant shall conduct the use of force investigation and complete the Use of Force Report. The Criminal Investigation Bureau shift commander shall assign a police lieutenant to investigate the more serious or complex use of force incidents.

D. SPECIFIC DIRECTIONS

Following are specific directions for completing the Use of Force Report:

    1. General Information

        a. Complete all fields (e.g., incident type, dates, times, address, and status).

        b. The address, the location of the subject at the time the use of force was initiated, must be verified.

        c. Details

            1. Indicate the location and lighting of the use of force.

            2. Indicate if video or audio was available and the name of the supervisor who reviewed the video. Supervisors shall attempt to obtain and review all video and/or audio recordings that may have captured the incident including video/audio from body worn cameras, mobile digital video / audio recording equipment, surveillance cameras, pole cameras, video obtained from citizens, etc. An electronic (CD/DVD) copy of any recovered video shall be forwarded to the Internal Affairs Division – Risk Management.

            3. Identify all citizen witnesses and include their name, sex, race, birth date, address, and phone number. For department members who are witnesses, complete only the name field using rank and name. For more than three witnesses, include all others in the notes/narrative section.

    2. Subject

Identify the person who was the object of the use of force. If several people were the objects of the force in a single incident, enter all subjects under the subject tab and complete all subject details.

    3. Employees

Identify all members who used force in the incident by entering them under the employee tab and linking them to the subject(s). Complete all employee

HIGHLY CONFIDENTIAL

details, including use of force details. Members who were present, but did not use force, are to be included in the details-witness fields.

a. Duty status: All members taking action in their official capacity are on duty. For the purpose of this report, indicate "Off Duty" if the member was off duty immediately prior to the incident.

b. Number of officer(s): Indicate whether the member was assigned to a one-officer or two-officer unit at the time of the incident.

c. Type of force used: Indicate the type(s) of force used (e.g., ECD, bodily force, firearm).

d. Bodily force: Indicate yes or no. Identify through use of DAAT terminology the specific type of force employed, followed by a bodily force description. For example: compliance hold (pressure points, come-along); decentralization; focused strike (hand, forearm, kick); or diffused strike, etc.

e. Baton: Indicate yes or no, the type, and the number of strikes.

f. Irritant/chemical/inflammatory: Indicate yes or no, the type of substance used: CS gas, or OC, including the amount discharged and the distance discharged.

g. Firearm: Indicate yes or no, the specific type of firearm used to include the make, model and serial number. Include the number of shots fired.

h. Less lethal type:

i. ECD: Indicate yes or no, number of cycles, and the serial number.

j. TEU related: Indicate yes or no.

k. Forced blood draw: Indicate yes or no. Include the description of the force used. See SOP 120.55.

4. Notes

a. Describe in a detailed narrative the incident and events leading to the use of force.

b. Statements shall be separately obtained and documented from the person the force was used against, from the officer(s) using force, and from all citizen and officer witnesses. An explanation of why

HIGHLY
CONFIDENTIAL

there was no statement obtained from any of the aforementioned shall also be included.

c. If the use of force resulted from a field interview, traffic stop, or other proactive activity, describe in detail the reasonable suspicion for the initial stop, pat-down, and/or search.

d. Describe in detail any events captured by video and audio recordings (e.g., body worn cameras, mobile digital video / audio recording equipment, pole cameras, private surveillance cameras, video obtained from citizens). Supervisors shall include a time stamp(s) in their report indicating the specific times of significant events captured by video.

## E. ADDITIONAL REPORTS AND INVESTIGATION

1. A written report from the member who uses force as defined in this order is not required if such member has given a detailed statement to the respective Criminal Investigation Bureau lieutenant or the field supervisor. However, this does not preclude further statements, or written reports by the member using force when so directed by the Chief of Police.

2. Whenever the use of force by a member is investigated as a personnel investigation, a claim, a notice of injury, or a summons and complaint is filed with the city of Milwaukee naming a member of the department, the member in question shall submit additional reports or provide statements when so directed by a supervisor.

## F. INTERNAL AFFAIRS DIVISION - RISK MANAGEMENT RESPONSIBILITIES

1. The Internal Affairs Division – Risk Management shall be responsible for the retention of all Use of Force Reports via the AIM system.

2. The commanding officer of Internal Affairs Division – Risk Management shall provide the Use of Force Report to the Police Academy for training purposes.

3. Use of force data will be analyzed / audited on a regular basis by the Internal Affairs Division - Risk Management.

## G. COMMANDING OFFICER'S REVIEW AND RECOMMENDATION

1. The member's commanding officer shall review the AIM system Use of Force Report and enter a recommendation under "Incident Tracking". When the commanding officer determines the use of force is in compliance,

HIGHLY
CONFIDENTIAL

these reports shall be forwarded through "Incident Tracking" and general information "Status" directly to the appropriate supervisor of the Internal Affairs Division - Risk Management.

2. If the review finds the member's use of force was not in compliance, training is needed, or if there are serious injuries requiring admission to a hospital or if death occurs, the commanding officer shall enter a recommendation under "Incident Tracking". These reports shall be forwarded through "Incident Tracking" and general information "Status" directly to their respective bureau commander. Commanding officers may, at any other time they believe notification to their bureau commander is warranted, forward the Use of Force Report to their bureau commander.

## 460.55 USE OF FORCE COMMITTEE

A. A Use of Force Committee shall conduct periodic comprehensive reviews of all use of force issues affecting the department.

B. The Chief of Police shall appoint police members to the Use of Force Committee, who shall serve a one-year term, subject to extension at the discretion of the Chief of Police.

C. The department's range master and a supervisor from Office of Management Analysis and Planning shall be standing members of the Use of Force Committee and shall not be subject to the aforementioned term limit.

D. The Use of Force Committee shall meet at least quarterly, or as otherwise directed by the Chief of Police, and shall focus on, but not be limited to, the following:

1. Appropriateness of use of force by department members.

2. Proper field supervision and supervisory review of use of force incidents.

3. Application and effectiveness of department policies and procedures concerning the use of force, including whether there has been a violation of SoP 1.05.

4. Proper use and effectiveness of equipment.

5. Effectiveness of use of force training.

6. Identification of training needs and opportunities for department members.

HIGHLY
CONFIDENTIAL

E. The Use of Force Committee shall prepare a written report of the committee's finding and/or recommendations, and submit such report to the Chief of Police within ten (10) days of the completed quarterly or directed review. The Chief of Police, or designee, shall submit a copy of this report to the Fire and Police Commission executive director within twenty (20) days of the completed quarterly or directed review. This report may be obtained through procedures established under Wisconsin Statues related to public records.

F. The Chief of Police, or designee, shall send correspondence to the Fire and Police Commission executive director if the Use of Force Committee quarterly meeting was not held.

G. Any recommendations or other matters for consideration by the Use of Force Committee shall be forwarded through the chain of command to the Office of the Chief.

HIGHLY
CONFIDENTIAL

## 747 – BODY WORN CAMERAS

...

**747.25        OPERATIONAL GUIDELINES**

...

## C. AUDIO / VIDEO RECORDING

### 2. Use of and Recording with the BWC

...

> **J. The failure of a** member to activate a body-worn camera as required by any portion of SOP 747, or the tampering with body-worn camera footage is a factor in assessing member credibility in any investigation into the conduct of the member. This section does not apply if the body-worn camera was not activated due to a malfunction of the body-worn camera, and the MPD member was not aware of the malfunction, or if exigent/emergency circumstances prevented activation.

HIGHLY
CONFIDENTIAL

## MILWAUKEE POLICE DEPARTMENT <u>OATH OF HONOR</u>

On my honor, I will never betray may badge, my integrity, my character, or the public trust.

I will always have the courage to hold myself and others accountable for our actions.

I will always uphold the Constitution, protect my community, and accomplish the mission of the Milwaukee Police Department.

I will demonstrate competence, have courage, be a person of integrity, exhibit leadership, show respect <u>regardless of race, gender or status</u>, and act with restraint.

This is my solemn vow.

23

HIGHLY
CONFIDENTIAL